**Larry Bernard SPIKES, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 282S68.**

Supreme Court of Indiana.

March 20, 1984.

Rehearing Denied May 10, 1984.

Susan K. Carpenter, Public Defender, C.H. Gardner, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Kathleen Ransom Radford, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Larry Bernard Spikes was found guilty of class B felony burglary, class A felony rape and class A felony criminal deviate conduct by a jury in the Elkhart Circuit Court on July 8, 1981. On July 13, 1981, Appellant was tried by the Elkhart Circuit Court and found guilty of class D felony attempted theft and class A felony rape. The trial judge subsequently sentenced Appellant to concurrent imprisonment terms of ten years for burglary, fifty years for rape and thirty years for criminal deviate conduct. The trial judge also sentenced Appellant to concurrent imprisonment terms of two years for attempted theft and fifty years for rape. These two groups of concurrent sentences were ordered to be served consecutively. Appellant now brings his consolidated direct appeal and raises the following four issues:

1. whether there was a proper waiver from the juvenile court to give the criminal trial court proper jurisdiction over Appellant;

2. whether the trial court erred by denying Appellant's Motion to Suppress;

3. whether the trial court erred by denying Appellant's Mistrial Motion; and

4. whether a certain in-court identification of Appellant was based on an unduly suggestive line-up.

J.B. testified that shortly after 7:00 p.m. on October 9, 1980, she was alone in her home in Elkhart. While putting freshly laundered sheets on her bed, a man grabbed her from behind, demanded money and ordered her to take off her pants. He also put his arm around her neck and ordered her not to look at him. J.B. told him where to find some money which he took. While continuing to grip her neck, the man told J.B. that he would slash her throat if she did not take off her pants. The man pulled J.B.'s T-shirt around her head to prevent her from seeing him and forced her to engage in vaginal and anal intercourse as well as fellatio. When the man was finished with J.B., he left her in the bedroom and went into the kitchen looking for money. He opened a glass cookie jar before fleeing. J.B. said that she was able to see her assailant and that he was a dark-skinned black man who was between 18 and 25 years old and 5'8" and 6' tall, had fairly short hair and wore a baseball type cap, a windbreaker and jeans.

At approximately 9:30 p.m. on October 20, 1980, A.H. was alone in her home in Elkhart when a man broke in through her kitchen door. The man told A.H. to remove her pants and, when she refused, he threatened to cut her. The man then grabbed one of A.H.'s knives and, while holding the knife to her neck, forced A.H. to engage in sexual intercourse against her will. He also found her handbag and emptied it before leaving. After the man was gone, A.H. discovered that the man had taken a package of Kool-Aid. A.H. described her assailant as a black man who was in his late teens or early twenties, had an "afro" style hair cut and wore a light colored jacket and a blue baseball cap with "Cat Diesel" printed on it.

On October 21, 1980, Elkhart Police Officer Tuttle reported for duty, was briefed about the recent rapes and was given a description of the suspected rapist. Later that day, Tuttle saw Appellant and noted that he fit said description. Tuttle detained Appellant but did not arrest him at that point. After Appellant agreed to go to the police station, Tuttle transported him there where Appellant was fingerprinted. When it was determined that Appellant's fingerprints matched the latent fingerprints taken from the cookie jar lid at J.B.'s home, Appellant was officially placed under ar-

rest. Since Appellant was sixteen years old when the crimes were committed, Appellant was charged as a juvenile delinquent in the juvenile court but subsequently was waived to the criminal court by the juvenile judge.

### I

Appellant first claims that the juvenile court did not have jurisdiction to waive him to criminal court and that the criminal court, therefore, did not have jurisdiction to enter judgment in his case. He specifically claims that the juvenile court did not have jurisdiction because he was not properly arrested pursuant to Ind.Code § 31–6–4–4(b) (Burns 1980). Said statute provides:

"A child may be taken into custody by any law enforcement officer acting with probable cause to believe that the child had committed a delinquent act."

The State contends that Appellant was properly taken into custody under the instant facts and circumstances. Appellant contends otherwise and claims that he did not agree to go to the police station with Tuttle but went because he thought he had to. At a pretrial suppression hearing, the State stipulated that Officer Tuttle did not have probable cause to arrest Appellant when Tuttle stopped Appellant. A stop, however, is different than an arrest. The United States Supreme Court has held:

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the *status quo* momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

*Adams v. Williams*, (1972) 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612, 617; *See Terry v. Ohio*, (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The Court of Appeals has held that a juvenile may be stopped under Ind.Code § 35–3–1–1 (Burns 1979) [repealed effective September 1, 1982] when an officer has observed the juvenile engaged in suspicious activity near the scene of a crime. *Graddy v. State*, (1978) 176 Ind.App. 518, 376 N.E.2d 506. A

police officer, therefore, need not have probable cause to arrest in order to make an investigatory stop, he need only be in possession of facts sufficient to warrant a man of reasonable caution to believe investigation appropriate. *Luckett v. State*, (1972) 259 Ind. 174, 284 N.E.2d 738. In the instant case, Officer Tuttle observed Appellant who fit the description given to him of the man who had perpetrated the instant rapes. In particular, Appellant was wearing clothing described by both of the victims including a baseball type cap with "Cat Diesel" written on it. We now find that Tuttle properly made an investigatory stop of Appellant pursuant to Ind.Code § 35–3–1–1 and *Terry, supra.* Tuttle's testimony was that Appellant agreed to accompany him to the police station. We will neither weigh the evidence nor judge the credibility of the witnesses. Appellant was not searched, handcuffed, or questioned although he was fingerprinted. We have held that fingerprinting is a jail house procedure which does not violate a defendant's Fifth Amendment right against self-incrimination and does not constitute an unreasonable search and seizure of evidence from the defendant. *Jones v. State*, (1977) 267 Ind. 205, 369 N.E.2d 418. When Appellant's prints were found to match prints found at one of the crime scenes, the police had sufficient probable cause to make an arrest which they did. Appellant's contention that the juvenile court had no jurisdiction over him accordingly must fail.

Appellant next claims that his waiver hearing was not held within twenty days after the petition alleging his delinquency was filed and that the juvenile court therefore did not have jurisdiction to waive him to criminal court. Appellant bases this contention on *Ind.Code* § 31–6–7–6(b) (Burns 1980) which provides:

"If the child is in detention and a petition has been filed, either a fact-finding hearing or a waiver hearing must be commenced within twenty [20] days (excluding Saturdays, Sundays, and legal holidays) after the petition is filed. If the child is not in detention, the hearing

must be commenced within sixty [60] days (excluding Saturdays, Sundays, and legal holidays) after the petition is filed."

It appears that the waiver hearing in Appellant's case was held thirty-four days after the delinquency petition was originally filed. Said petition was filed on October 29, 1980, and the waiver hearing was held on December 15, 1980. The record shows that during the time period between those dates, a detention hearing was held on October 23, a preliminary inquiry and investigation report was filed on November 24, a petition to waive to adult court was filed on November 26, and a detention review hearing was held on December 2 when Appellant was remanded to the juvenile jail. At the waiver hearing, the trial court recognized that the deadline dictated by Ind. Code § 31-6-7-6(b) had been missed and accordingly ordered Appellant released on his own recognizance in the custody of his brother until a final waiver determination could be made. The trial court based its order on Ind.Code § 31-6-7-6(g) (Burns 1980) which provided that if a child is in detention beyond said statutory deadline, the child shall be released on his own recognizance to his parents, guardian or custodian. The State contends that since Appellant was released, he was not prejudiced by the delay in his case beyond the twenty day period. We note that between October 29 and December 15, Appellant's motion for a change of judge was granted. It does not appear that the length of time it took to grant a change of judge justified the length of time that Appellant was held without a waiver hearing beyond the basic twenty day period. We agree with the State, however, that the twenty day limitation, although stated in mandatory terms, does not indicate that the Legislature intended that the juvenile court would lose jurisdiction of the juvenile if the deadline were not met or that a juvenile should be discharged if the time limit was exceeded. Ind.Code § 31-6-7-6(g) provides that if a child is in detention and the twentieth day arrives, then that child will be released. The record indicates that when it was brought to the attention of the court that Appellant had been detained more than twenty days, the trial judge immediately released Appellant according to Ind.Code § 31-6-7-6(g). Any previous failure to release Appellant on his own recognizance did not remove the jurisdiction of the juvenile court nor did it require Appellant's discharge. There is, therefore, no merit to this contention.

Appellant next argues that neither he nor his guardian were informed of the consequences of his waiver to adult court. It is difficult to determine what Appellant means by this argument, however, since he cites us to Ind.Code §§ 31-6-4-13(d) and 31-6-4-13(e) (Burns 1980) which provide:

"(d) The [juvenile] court shall next determine whether the prosecutor intends to seek a waiver of jurisdiction under IC 31-6-2-4. If waiver is sought, the court may not accept an admission or denial of the allegations from the child under subsection (i) and shall schedule a waiver hearing and advise the child according to subsection (e).

(e) The [juvenile] court shall inform the child and his parent, guardian, or custodian, if that person is present, of:

(1) the nature of the allegations against the child;

(2) the child's right to:

(A) Be represented by counsel;

(B) Have a speedy trial;

(C) Confront witnesses against him;

(D) Cross-examine witnesses against him;

(E) Obtain witnesses or tangible evidence by compulsory process;

(F) Introduce evidence on his own behalf;

(G) Refrain from testifying against himself; and

(H) Have the state prove that he committed the delinquent act charged beyond a reasonable doubt;

(3) the possibility of waiver to a court having criminal jurisdiction; and

(4) the dispositional alternatives available to the juvenile court if the child is adjudicated a delinquent child."

Appellant does not specifically indicate when and how the trial court failed to advise him pursuant to this statute other than to generally allege that the juvenile court did not follow the statute. The State contends that the trial court did timely inform Appellant of the nature of the allegations against him and of his constitutional rights. Since Appellant has not indicated to us how the juvenile court erred in this regard, we find nothing to review.

■ Appellant next claims that he was denied his right to properly cross-examine witnesses during his detention and waiver hearings as the evidence presented during those hearings was based on hearsay. The Court of Appeals has found that the admission of hearsay evidence during a juvenile waiver hearing is not a *per se* denial of due process. *Clemons v. State*, (1974) 162 Ind. App. 50, 317 N.E.2d 859, *cert. denied*, (1975) 423 U.S. 859, 96 S.Ct. 113, 46 L.Ed.2d 86. *Clemons* carefully distinguished the nature of a waiver hearing from that of a delinquency hearing or trial. The juvenile waiver hearing is dispositional in nature and the hearsay rules do not apply since the evidence in the waiver hearing is not offered to prove the juvenile guilty of the alleged crime beyond a reasonable doubt. The purpose of the evidence is to show that it is substantial enough to find that the juvenile committed the crimes and that jurisdiction should be waived to criminal court so that the juvenile may there be charged and tried. A waiver hearing is more akin to a probable cause hearing than to an actual trial and therefore hearsay evidence is permissible. Accordingly, there is no merit to Appellant's contention here. It appears to us from the instant record that the juvenile court properly followed all of the procedures provided for in the juvenile code and Appellant was properly waived from juvenile court to criminal court.

## II

■ Appellant next contends that the criminal trial court improperly denied Appellant's motion to suppress his finger-prints which were taken at the police station. We previously have found that Appellant was properly in the custody of the police when his fingerprints were taken. The taking of Appellant's fingerprints was permissible. *Jones, supra.* The trial court therefore properly denied Appellant's motion to suppress.

## III

■ During *voir dire* of the jury panel, the State questioned prospective juror Jeff Best regarding the efficacy of fingerprint evidence. Best stated that he was familiar with fingerprinting. At that point, Appellant moved for a mistrial on the grounds that the State had gone beyond the proper scope of *voir dire*. The trial court denied Appellant's motion but asked Appellant if he wanted an admonishment. Appellant stated that he did not want an admonishment but that an admonishment should be given after the jury was selected. The decision to grant a mistrial because of improper *voir dire* lies within the sound discretion of the trial court. *Blackburn v. State*, (1979) 271 Ind. 139, 390 N.E.2d 653. Appellant does not indicate how the jury was prejudiced by this interrogation of Best. Appellant also does not show that Best or any other juror was unable to render a fair verdict. The trial court offered to admonish the jury and sustained objections to questions on *voir dire* regarding fingerprinting. Since appellant does not show that he was placed in grave peril by the State's conduct, we do not find that the trial court abused its discretion by denying the requested material.

## IV

■ Appellant finally argues that the trial court erred by allowing A.H. to identify him in-court since her identification was the product of his illegal arrest and an impermissibly suggestive line-up. Appellant proffers no facts to indicate how the line-up procedures followed by the police were impermissibly suggestive. Appellant's complaint therefore goes to the weight of A.H.'s testimony and not to its admissibili-

ty. A.H. said that she was able to observe Appellant well enough during her encounter with him to identify him. At the line-up, A.H. indicated that she thought Appellant was the one who committed the crimes against her but that she was not certain. She was able, however, to identify Appellant in court as being the man who attacked her. A.H. admitted that after the line-up, she saw the fingerprint report on Appellant which indicated that Appellant's fingerprints were found on the cookie jar in the other victim's apartment. Her trial testimony was that she was able to observe Appellant while he was in her home and therefore could identify him as being the man who attacked her. A.H. specifically testified that when Appellant forced his way into her home, he turned the lights off in her living room so that she could not identify him. She also testified that she turned the lights back on and could see Appellant's face in the light before he again turned the lights off. These facts were all presented to the jury. The reliability of A.H.'s testimony therefore was based on her credibility as determined by the jury. *Head v. State,* (1982) Ind., 443 N.E.2d 44; *Hill v. State,* (1982) Ind., 442 N.E.2d 1049. There was no evidence that A.H.'s testimony was based on an unduly suggestive line-up and the trial court properly refused to exclude her identification testimony.

Finding no error, we affirm the trial court in all things.

GIVAN, C.J., and HUNTER and PRENTICE, JJ., concur.

DeBRULER, J., concurs in result with separate opinion.

DeBRULER, Justice, concurring in result.

When appellant arrived at the police station he was taken to an interrogation room and was joined there by a detective. It soon was evident that appellant was a juvenile and could not be questioned in the absence of a conference with an adult relative or lawyer. Efforts were then made to contact appellant's brother. During this process, the detective received a command from higher up to take appellant's fingerprints. Appellant testified that he was told that he would not be permitted to leave until he provided his prints. The detective testified that if appellant had attempted to leave at that time he would have been stopped. This directive and the detention which it involved constituted a potential Fourth Amendment violation. It is, I believe, helpful to separate it from the events which occurred on the street, the investigative stop, the request to travel to the police station, appellant's assent to go in for questioning, his transportation there, and his placement in an interrogation room. The initial intrusion on the street and the fingerprinting are the two levels involving potential Fourth Amendment violations which are present whenever physical evidence is obtained from a person. *United States v. Dionisio,* (1973) 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67. The initial stopping of appellant on the street is like the intrusion which was sanctioned in *Terry v. Ohio,* (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, and unlike the situation condemned in *Davis v. Mississippi,* (1969) 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676, where a large number of young black males were seized and subjected to fingerprinting where no specific description of a suspect was available. The transportation of appellant to the police station and his placement in an interrogation room for a session of interrogation is justified by appellant's free and voluntary consent. That this consent was more than a mere submission to lawful authority is evident from appellant's conditioning of his consent upon being transported in an unmarked vehicle.

On the basis of the foregoing the conclusion is warranted on this record that appellant's investigative detention in the interrogation room at that point in time when he received the command to give his prints was constitutional. The next question is whether the further detention or restraint for printing was a constitutional violation in itself. The answer must be in the negative in light of the similar situation ad-

dressed in *United States v. Dionisio, supra.* There a man received a subpoena to appear before a grand jury. He was told that he was a target of the investigation, and ordered to go to a particular place and provide a voice exemplar. He refused and was ordered by a court to comply; he again refused and was found in contempt. The finding was upheld. In the course of doing so, the United States Supreme Court reasoned that at that point in time when the man was ordered to supply the voice exemplars, he was in lawful and constitutional detention or restraint, and rejected the argument that the order to supply the voice exemplars was a further intrusion requiring justification under the Fourth Amendment. A police order to provide prints is, I judge, equal in measure for these purposes to the grand jury order, enforceable by exercise of court contempt powers, to provide voice exemplars. I therefore agree that the prints and their product were admissible, as is concluded in Part II of the majority opinion.