**James MOORE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 10A04–9903–CR–134.

Court of Appeals of Indiana.

Jan. 31, 2000.

William P. McCall, III, David E. Mosley, Mosley, Bertrand, Jacobs & McCall, Jeffersonville, Indiana, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Sarah E. Scherrer, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge

### Case Summary

James Moore appeals his conviction for attempted murder,[1] a Class A felony, following a jury trial. We affirm.

### Issues

Moore raises three issues which we restate as:

1. Whether the trial court abused its discretion by waiving Moore's case to adult jurisdiction;

2. Whether the trial court properly denied Moore's motion to suppress the statements he made to the investigating police officers at the scene of the accident; and

3. Whether there was sufficient evidence to support Moore's conviction for attempted murder.

### Facts and Procedural History [2]

The facts most favorable to the verdict reveal that both Moore and Josh Walker were involved in a relationship with Stacy Eicher.[3] During a July 1997 telephone conversation between Moore and Walker, Moore threatened to kill Walker.

On November 7, 1997, after an earlier argument, Eicher, Walker, and Moore were all at Eicher's house when the argument escalated. Moore again stated that he was going to kill Walker. Moore and Walker fought outside and Moore got into his car to leave. Walker was beside the car, beating on the window and kicking the tire. Moore started his car, backed up a little bit and then proceeded to pull forward, brushing Walker and knocking him off balance. Moore drove off but then turned his car around and proceeded to drive back toward Walker at a high rate of speed for a residential area. Moore drove up onto the yard and struck Walker. The impact fractured Walker's left leg, shattered the car's windshield, and dented the car's hood.

Moore returned to Eicher's house where Bill McGregory, a mail carrier who witnessed the incident, instructed Moore to stay. Off-duty officer Scott Merchant reported to the scene of the accident wearing plain clothes and driving an unmarked car. He approached Moore and asked him if he was involved in the accident to which Moore responded affirmatively. Officer Rayborn then arrived at the scene and Merchant informed him about the accident. Rayborn placed Moore in the back

---

1. Ind.Code § 35–41–5–1, Ind.Code § 35–42–1–1.

2. Oral argument was held on January 13, 2000 in Indianapolis. We would like to note that appellant's counsel, David Mosley, was clearly passionate about his client and the issues presented. We further appreciate his candor during argument, never intending to mislead the court in any way and stating that he would not answer if he was not positive about certain facts or law.

3. Eicher dated Walker on and off from either 1993 or 1994 to 1997. R. 565. She began dating Moore in March of 1997. R. 567. Although the record indicates that Eicher dated Moore exclusively for a while, in October of 1997, Eicher, Walker, and Moore were present when she decided that she "was going to date both of them." R. 574. However, she was "mostly" with Moore between October and November of 1997. *Id.*

seat of his car[4] to gather information from him for the accident report. Moore was not free to leave the scene of the accident until the officer had been given the information he needed for and completed his accident report.

For the accident report, Rayborn asked Moore for his license and registration and questioned him about what had happened. Moore then told the officer that he and Walker had argued and that after he left in his vehicle, he turned around, drove up on the sidewalk and struck Walker. After Rayborn received this information from Moore he contacted his shift leader and the decision was made to charge Moore with attempted murder.

At that time, Moore was handcuffed and read his Miranda Rights. Rayborn then proceeded to begin filling out paperwork and realized that Moore was a juvenile.

Moore was arrested on allegations of attempted murder and criminal recklessness. Because he was a juvenile, the allegations were filed as a delinquency petition. After a waiver hearing, the trial court waived juvenile jurisdiction. Moore was subsequently charged with attempted murder, a Class A felony, and criminal recklessness, a Class C felony. Moore filed a motion to suppress the statements he made at the scene of the accident to Rayborn; however, at a hearing on the motion, it was denied.

At Moore's jury trial he was found guilty and convicted of both attempted murder, a Class A felony, and criminal recklessness, a Class C felony. During Moore's sentencing hearing, the trial court vacated the conviction for criminal recklessness and

sentenced Moore to thirty years imprisonment for attempted murder. Moore now appeals.

Additional facts will be provided as necessary.

*Discussion*

I. *Waiver of Juvenile Jurisdiction*

■ Moore argues that the trial court abused its discretion when it waived his case to adult jurisdiction because the court failed to consider alternative dispositions available through the court's juvenile jurisdiction and failed to articulate reasons why such alternatives were inappropriate. Moore contends that the trial court, in finding that it was proper to waive juvenile jurisdiction, relied on criteria that did not support such a finding. Moore also argues that the trial court abused its discretion when it questioned a witness about a previous incident regarding Moore.

■ We review a juvenile court's[5] decision to waive its jurisdiction for abuse of discretion. *Vance v. State*, 640 N.E.2d 51, 57 (Ind.1994). "It is for the juvenile court judge, after weighing the effects of retaining or waiving jurisdiction, to determine which is the most desirable alternative." *Id.* (citation omitted).

A. *Presumption of Waiver – Rebutting the Presumption*

Waiver of juvenile jurisdiction is governed by Indiana Code section 31-30-3-5, which provides in pertinent part that:

the court shall, upon motion of the prosecuting attorney and after full investiga-

---

4. It is unclear from the record whether the car Moore was placed in at this time was his own car or Rayborn's police car. Merchant, when describing the events at the scene after Rayborn was present, stated that "he put the defendant in the back of his car which on a lot of occasions we do do. We put them in to gather information for an accident report." R. 425. Given this statement, and the fact that the State says "[d]efendant was seated in a police cruiser during part of his conversa-

tion with Officer Rayborn," Brief of Appellee at 9, we will assume that Moore was placed in the back of Rayborn's police car when Rayborn was questioning him about the accident.

5. We note that here, it was the trial court that waived its juvenile jurisdiction and transferred the case to its adult felony docket. Therefore, there was no separate juvenile court in this cause.

tion and hearing, waive jurisdiction if it finds that:

(1) the child is charged with an act that, if committed by an adult would be:

    (A) a Class A felony . . . ;

. . .

(2) there is probable cause to believe that the child has committed the act; and

(3) the child was at least sixteen (16) years of age when the act charged was allegedly committed;

unless it would be in the best interests of the child and of the safety and welfare of the community for the child to remain within the juvenile justice system.

Ind.Code § 31–30–3–5.

Here, the trial court conducted a hearing on the State's motion to waive jurisdiction. The trial court found that Moore was charged with committing attempted murder, which is a Class A felony if committed by an adult, there was probable cause to believe that Moore committed the acts alleged,[6] and Moore was seventeen (17) years of age[7] on November 7, 1997,

the date when the "act[s] charged w[ere] allegedly committed." *Id.*

■ Proof of these elements creates a presumption in favor of waiver. *Hagan v. State,* 682 N.E.2d 1292, 1295 (Ind.Ct.App. 1996). Although Moore argues that the trial court erred in not considering alternate juvenile system options,[8] the burden is on the juvenile to present evidence and prove that waiver is not in his best interest or that of the safety and welfare of the community. *Hagan,* 682 N.E.2d at 1295.

Moore contends that the trial court abused its discretion when it waived juvenile jurisdiction because it would have been in his best interest and the safety and welfare of the community for him to remain in the juvenile justice system. He asserts that he satisfied his burden of proving that waiver was not in his best interest or the best interest of the safety or well being of the community.

Moore had the opportunity to, and did, present evidence in an attempt to rebut the presumption of waiver that was established. He demonstrated that he was enrolled in school, had been involved in a job

---

**6.** *See* R. 14 (the court's "Finding Of Probable Cause").

**7.** Moore's date of birth is January 19, 1980.

**8.** Moore cites *Ingram v. State,* 160 Ind.App. 188, 310 N.E.2d 903 (1974), arguing that the trial court had a duty to consider alternate dispositions available through the juvenile system, "and if the juvenile Court concludes such dispositions are without value it must specify reasons for that conclusion. Those reasons must be supported by the record of either the preliminary hearing or the waiver hearing." *Id.* at 904–05 (*citing Atkins v. State,* 259 Ind. 596, 290 N.E.2d 441 (1972)). Based on this, Moore argues that the trial court erred because it "failed utterly to consider the other dispositions available to it. . . ." Brief of Appellant at 10. And, relying on *Atkins* and *Cartwright v. State,* 168 Ind.App. 517, 344 N.E.2d 83 (1976), Moore continues: "[t]he trial Court failed to specify reasons why such alternative and available dispositions short of waiver were not appropriate. . . . The order must demonstrate that the Court has considered the alternate dispo-

sitions available and must state its reasons for rejecting them." Brief of Appellant at 10.

Moore failed to note, however, that *Gregory v. State,* 270 Ind. 435, 386 N.E.2d 675 (1979), clarified that *Atkins* was decided when the juvenile statute of the time did not require a waiver hearing and contained no criteria governing the waiver decision. *Id.* at 679. "A full waiver hearing is now mandated by statute and statutory criteria for waiver have been stated." *Id.* Although *Gregory* refers to Indiana Code section 31–5–7–14, and the content has been changed, that statute is now known as Indiana Code section 31–30–3–5. Thus, "waiver is to be the rule and retention in the juvenile system the exception." *Gregory,* 386 N.E.2d at 679. Although there is a statutory guideline for determining waiver, it does not "vitiate the requirement of the case law that the findings be sufficiently clear to permit review." *Id.* Therefore, in making its waiver decision, the court's findings need to be "sufficiently clear and specific and provide adequate support for the waiver order made pursuant to Ind.Code § 31–5–7–14(b) [now Ind.Code § 31–30–3–5]." *Id.* This was done by the trial court here.

training program at school, worked to help pay bills at home, and volunteered for political campaigns. He also showed that he had previous anger outbursts but had not been treated.

Moore argues that Robert Jones, a probation officer who had never spoken to Moore, testified that Moore was beyond rehabilitation by the juvenile justice system, but could report that Moore had " 'done well' and had 'maintained the highest level' during his detention." Brief of Appellant at 7.

The trial court noted that:

[w]hile a number of [Moore's] qualities may be somewhat admirable, and while it may be true that James is in need of anger management counseling, this court finds it to be insufficient reason to retain James [Moore] in the juvenile justice system. Moreover, this testimony is overshadowed by that of Chief Probation Officer Robert C. Jones. Mr. Jones testified that at James Moore's age, (he will be eighteen (18) years old on January 19, 1998), there are few rehabilitative options practically available to him within the juvenile justice system.... [T]he most restrictive rehabilitative option available for James Moore, and the only one appropriate for the acts charged in Mr. Jones' estimation, would be commitment to the Clark County Juvenile Detention Center for up to 120 days. This option, however, would provide James Moore with only minimal rehabilitation.

R. 256. The trial court considered Moore's attempt to rebut the presumption of waiver, but concluded that "Moore has been unable to overcome this [waiver] presumption with evidence that it would be in his best interests and the best interests of the safety and welfare of the community for him to remain within the juvenile justice system." R. 257.

The trial court heard and considered the evidence before it and determined that the presumption of waiver had not been overcome. The trial court's discussion demonstrates that the court's findings were sufficiently clear and specific. Further, the "supporting facts must appear either in the order or in the record of the waiver hearing." *Daniel v. State,* 582 N.E.2d 364, 368 (Ind.1991), cert. denied, 506 U.S. 838, 113 S.Ct. 116, 121 L.Ed.2d 72 (1992).

This case is similar to the situation in *Daniel* (holding that waiver was appropriate and ample facts existed that it would not be in the best interests of the community to retain the defendant in the juvenile system where defendant shot a high school band director, hit him with a hammer, and burglarized the school), where "the viciousness of appellant's attack, the lack of justification for it, the seriousness of its results, and the relatively mature age, 17, of the juvenile" supported the determination that waiver was in the community's best interests. *Id.* In a fit of jealous rage, seventeen year old Moore plowed down an individual in his vehicle. Given these facts and all evidence presented, the trial court provided adequate support for the waiver order pursuant to Indiana Code section 31–30–3–5.

### B. *Witness Questioning*

■ Moore argues that the trial court also abused its discretion by questioning Jones during the waiver hearing because by doing so, the judge assumed an adversarial role. Further, he asserts that the information elicited from Jones was improper hearsay.

■ We note initially that there was no objection made at the hearing with respect to the questioning of Jones. Further, Moore concedes that no objection was made.[9] Failure to object results in waiver of any claim of error on appeal. *Angleton v. State,* 714 N.E.2d 156, 159 (Ind.1999).

---

9. "It can hardly be said that James' [Moore's] public defender can be blamed for failing to object to this hearsay testimony." Brief of Appellant at 14.

■ Waiver notwithstanding, the questioning of Jones by the trial court was not improper. Moore is correct in his assertion that a judge may not assume an adversarial role in any proceeding. However, a judge's discretion in questioning witnesses is broader in bench trials than in trials before juries.[10] *Griffin v. State*, 698 N.E.2d 1261, 1265 (Ind.Ct.App.1998), *trans. denied.* Further, the judge "may intervene in the fact-finding process and question witnesses in order to promote clarity or dispel obscurity." *Id.*

Moore contends that Jones' testimony had not been unclear or obscure. However, "[t]o make a showing of reversible error, the defendant must show that the trial judge's questioning of witnesses was harmful and prejudicial to his case." *Id.* Although Moore claims that the testimony elicited was prejudicial, there was not a jury present, and the judge was not making a decision regarding Moore's guilt in the matter. The hearing was to determine whether waiver of juvenile jurisdiction was proper; the judge did not mention the information he questioned Jones about in his decision. Given all of the evidence that the judge had before him, even if the information received was prejudicial, there was ample evidence to support the judge's finding that the presumption of waiver had not been rebutted. The trial court judge did not abuse his discretion.

■ Moore also contends that the information that Jones testified about was improper hearsay. "[A]dmission of hearsay evidence during a juvenile waiver hearing is not a *per se* denial of due process." *Spikes v. State*, 460 N.E.2d 954, 958 (Ind.1984), *rev'd and remanded on other grounds*, 471 U.S. 1001, 105 S.Ct. 1861, 85 L.Ed.2d 155 (1985). The nature of a juvenile waiver hearing creates a situation where the rules regarding hearsay are not the same as in a trial or a delinquency hearing. *Id.*

The juvenile waiver hearing is dispositional in nature and the hearsay rules do not apply since the evidence in the waiver hearing is not offered to prove the juvenile guilty of the alleged crime beyond a reasonable doubt. The purpose of the evidence is to show that it is substantial enough to find that the juvenile committed the crimes and that jurisdiction should be waived to criminal court so that the juvenile may there be charged and tried. A waiver hearing is more akin to a probable cause hearing than to an actual trial and therefore hearsay evidence is permissible.

*Id.*

Thus, even if Jones' statements were hearsay, there is no merit to Moore's argument here. Given the fact that the presumption for waiver was established and given all of the evidence that was before the trial court, the trial court properly followed Indiana Code section 31–30–3–5 and the waiver of juvenile jurisdiction was proper.

II. *Suppression of Statements*

■ Upon review of the denial of a suppression motion,

we review the record for substantial evidence of probative value to support the trial court's ruling. We do not reweigh the evidence. We resolve conflicting evidence in favor of the trial court and consider any substantial uncontroverted evidence. If the basis for the ruling on a motion to suppress is unclear, we will uphold the trial court if a reasonable view of the evidence supports the trial court's decision. The credibility of witnesses is for the trial court to determine.

*Willsey v. State*, 698 N.E.2d 784, 789 (Ind. 1998) (citations omitted).

■ Moore contends that while being questioned by Rayborn for the incident report he was not free to go; thus, the interrogation was custodial in nature and

---

**10.** Additionally, we note that this was a pretrial hearing, which is dispositional in nature. Therefore, the judge here is entitled to even greater deference as there was no jury present, and the judge was not making a decision on Moore's guilt or innocence.

he should have received Miranda warnings. He argues that because he did not, his statements should have been suppressed. Further, he contends that the procedures delineated in Indiana Code section 31–32–5–1, involving the waiver of a juvenile's rights, should have been followed, but were not, also requiring that the statements be suppressed.

When a juvenile who is not in custody gives a statement to police, the general rule is that neither the safeguards of Miranda warnings nor the juvenile waiver statute [11] is implicated. *A.A. v. State,* 706 N.E.2d 259, 261 (Ind.Ct.App.1999) (*citing Sevion v. State,* 620 N.E.2d 736, 738 (Ind.Ct.App.1993)). Thus, the relevant issue that must be determined is whether Moore was subject to a custodial interrogation.

An individual does not have to be under arrest in order for an interrogation to be custodial in nature. *Id.* "To be custodial in the non-arrest context, the interrogation must commence after the person's freedom of action has been deprived in any significant way." *Id.*

Moore argues that because he was not free to leave the scene of the accident and because he had a duty to remain at the scene to provide information for an accident report as required by Indiana Code section 9–26–1–1,[12] he was subject to a custodial interrogation.[13] The State contends that although Moore was in a police cruiser, he was not handcuffed or restrained in any way and therefore, he was not in custody and it was not necessary that Moore be read his Miranda rights. However, the police officers stated that Moore was not, in fact, free to leave the scene. Additionally, the State's argument is flawed in that it is not necessary to be "in custody" in the arrest context in order to be subject to a custodial interrogation.

The trial court reasoned, in denying the motion to suppress, that the officers had a duty to investigate accidents and complete a report. Indiana Code section 9–26–2–1 states that an "officer shall investigate each motor vehicle accident that results in ... [t]he injury or death of a person...." Further, law enforcement officers "shall forward a written report of each accident investigated ... to the state police department...." Ind.Code § 9–26–2–2.

However, the mere fact that officers have a duty to fill out accident reports does not negate the fact that Moore was

11. Indiana Code § 31–32–5–1 provides:

Any rights guaranteed to a child under the Constitution of the United States, the Constitution of the State of Indiana, or any other law may be waived only:
(1) by counsel retained or appointed to represent the child if the child knowingly and voluntarily joins with the waiver;
(2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
  (A) that person knowingly and voluntarily waives the right;
  (B) that person has no interest adverse to the child;
  (C) meaningful consultation has occurred between that person and the child; and
  (D) the child knowingly and voluntarily joins the waiver.

12. Indiana Code § 9–26–1–1 states:

The driver of a vehicle involved in an accident that results in the injury or death of a person shall do the following:

(1) immediately stop the vehicle at the scene of the accident or as close to the accident as possible in a manner that does not obstruct traffic more than is necessary.
(2) Immediately return to and *remain at the scene of the accident* until the driver does the following:
  (A) Gives the driver's name and address and the registration number of the vehicle the driver was driving.
  ...
(3) Immediately give notice of the accident by the quickest means of communication to one (1) of the following:
  (A) the local police department....
  (B) The office of the county sheriff....
(4) Within ten (10) days after the accident, forward a written report of the accident to the state police department.

13. A person who fails to give notice of an accident or to stop and remain at the scene of an accident resulting in death or injury commits a Class C misdemeanor. Ind.Code § 9–26–1–9.

not free to go. The information that he was required to provide to the officers for the accident report was incriminating and was elicited from him in a situation where there was a restriction on his freedom.

Further, the officer's duties as enumerated in Title nine do not override the procedural safeguards afforded to juveniles. Moore correctly points out that where a juvenile would be considered a "child 'alleged to have committed an act that would be an offense under IC 9–30–5, if committed by an adult[,]' ... such a person's case would properly be governed by the juvenile code and that person would be entitled to the juvenile waiver safeguards...." *Wehner v. State*, 684 N.E.2d 539, 541 (Ind.Ct.App.1997) (citation omitted).

Moore, placed in the back seat of a police cruiser, could not leave the scene and had a duty to provide information for an accident report. However, although Moore was not free to leave, the questioning was custodial in nature, and Indiana Code section 9–26–1–1 does place an individual in a custody-type situation, Moore was not "in custody" until the investigating officer knew he was dealing with a potential crime scene. Although Moore had to wait to provide information for an accident, he was not "in custody" until Rayborn knew or should have known that he was investigating a potential crime when he was asking Moore questions.

Merchant testified that when he saw Rayborn on the scene, he "turned around and gave him [Rayborn] information about the accident." R. 419. He also said that he "told him what was told to me, it was just information as to who the driver of the car was, who the victim was and then we started working an accident report, he put the defendant in the back of his car which on a lot of occasions we do do. We put them in to gather information for an accident report." R. 420.

Rayborn testified that upon arrival at the scene, "Officer Merchant advised that the driver was on Appletree and the victim was where he was at, he was talking to him on Accrusia. I checked on the victim and noticed that he had injuries to his leg and his arm. I went to the driver of the car, who was identified as Mr. Moore and began working what we normally do, an accident report." R. 426. Rayborn then proceeded to ask Moore for his license and registration and asked him what happened in the accident. He stated that he had not, at this time, read Moore his Miranda rights because "at that time [he] was still investigating an injury accident, not knowing the total circumstances of that until after he made that statement." R. 428.

When questioned about whether he had spoken to any of the witnesses when he arrived on the scene Rayborn stated that he had not spoken to any of them "at that time." R. 542. He stated that he "talked to Officer Merchant." *Id.* He further stated that he "was under the impression it was just a pedestrian hit, ... [he] assum[ed] that someone was crossing the street and got hit by a car." *Id.*

Based on Rayborn's testimony that he believed, upon his arrival, it was an accident scene and not a crime scene, Moore was not being subjected to a "true" custodial interrogation.[14] Because the record is unclear as to exactly what Merchant told Rayborn, we must assume that Rayborn was questioning Moore with only the intent of eliciting information about an accident and not a crime.

We note, however, that regardless of whether an individual is a juvenile or an adult, at the moment during the investigation of an accident that an officer knows or should know that the investigation is contemplating a crime or will turn into an investigation that is criminal in nature, the individual must be read his or her Miranda rights immediately. At the point at which

---

14. It was custodial to the extent that Moore could not leave, however, the questions were not asked in an attempt to elicit incriminating information to be used against Moore.

the information-gathering process for an accident becomes for the purpose of obtaining information related to a crime, individuals are then being subjected to a custodial interrogation and have the right to receive their Miranda warnings. This, of course, would be something to be determined on a case-by-case basis.

We further note that even if it would have been proper for Moore's statements to be suppressed, there was enough other evidence provided to the trial court through witness testimony to support his conviction.

### III. Sufficiency of the Evidence

Our standard of review when considering the sufficiency of evidence is well settled. We will not reweigh the evidence or assess the credibility of witnesses. *Garrett v. State,* 714 N.E.2d 618, 621 (Ind. 1999). Only the evidence most favorable to the verdict, together with all reasonable inferences that can be drawn therefrom will be considered. *Weaver v. State,* 702 N.E.2d 750, 752–53 (Ind.Ct.App.1998). If a reasonable trier of fact could have found the defendant guilty based on the probative evidence and reasonable inferences drawn therefrom, then a conviction will be affirmed. *Id.*

In order to prove that Moore was guilty of attempted murder, the State was required to prove that Moore knowingly or intentionally "engage[d] in conduct that constitute[d] a substantial step toward commission of the crime [murder]." Ind. Code § 35–41–5–1. Thus, the State was required to show that Moore knowingly or intentionally took a substantial step toward killing another human being.[15]

Moore contends that the evidence was not sufficient to prove that he intended to kill Walker. He asserts that the threat to

Walker in July of 1997 that he was going to kill him is not relevant to prove that he intended to kill Walker on November 7, 1997, because of the four month differential. He further asserts that both Eicher and Walker state that he threatened to kill Walker, but he testified to the fact that the only threat he made was to say that, "if he [Walker] did not leave Eicher alone he would rip off his balls and stuff them in his mouth." Brief of Appellant at 22. We decline Moore's invitation to judge the credibility of the witnesses.

Moore also invites us to reweigh the evidence by stating that during the October meeting between the trio (the meeting at which Eicher decided that she would date both of them), Moore did not threaten Walker. Regardless of the fact that Moore and Walker had one amicable ending to a conversation does not mean that Moore did not previously threaten Walker or that he would not do it again in the future.

Further, Eicher testified that on November 7, before he got into his car, Moore again said that he was going to kill Walker. R. 582–83. Moore argues that "Walker testified he didn't hear any direct threats made by Moore to kill him." Brief of Appellant at 22. However, the record reflects that Walker may not have heard a specific threat on his life, but he did testify that Moore was saying things to him of a threatening nature on November 7. R. 705–07. Again, we will not judge the credibility of the witnesses.[16]

Moore asserts that unlike the situation in *Johnson v. State,* 455 N.E.2d 932 (Ind. 1983), in which the defendant was convicted of attempted murder where she was seen with a mean look on her face and deliberately steering her car toward two people that she struck and yelled threats

---

15. "A person who knowingly or intentionally kills another human being ... commits murder." Ind.Code § 35–42–1–1(1).

16. Moore continues to argue what certain witness did or did not testify to at trial. For

the sake of brevity, we will, for the final time, remind Moore that we will not reweigh the evidence or judge the credibility of the witnesses.

at, there was no evidence that he "steered his vehicle out of the way in order to hit Walker," r. 26, or that he "deliberately steered his car toward Walker or had a mean look on his face before Walker was struck." R. 27. Regardless of whether these factors were present here, there was testimony that Moore threatened to kill Walker twice. He brushed Walker once with his car, and then returned at a high rate of speed and hit him a second time, breaking Walker's leg.

Intent is a mental function, and absent an admission, must be determined through a consideration of a defendant's conduct and the natural and usual consequences of such conduct. *State v. McGraw*, 480 N.E.2d 552, 554 (Ind.1985). Moore also argues that the natural and usual consequences of his actions was not to kill Walker. However, Moore's threats, the speed he approached Walker with in his car, and the fact that he did, indeed strike Walker with his car was all evidence presented at trial. This is sufficient evidence to support that Moore did have the requisite intent necessary to sustain his conviction for attempted murder.

### Conclusion

We hold that the trial court did not err in waiving juvenile jurisdiction over Moore. Although Moore was not free to leave the scene of the accident and had to answer Rayborn's questions, because Rayborn believed he was eliciting information pertaining to an accident and not a crime, it was not necessary for Rayborn to automatically read Moore his Miranda rights. Thus, the trial court's denial of the motion to suppress Moore's statements was not in error. Finally, there was sufficient evidence to sustain Moore's conviction for attempted murder.

Affirmed.

BROOK, J., and KIRSCH, J., concur.