Travis L. **ROBERSON**, Appellant–
Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 40A01–0711–CR–500.

Court of Appeals of Indiana.

Jan. 29, 2009.

Joseph M. Cleary, Hammerle & Cleary, Indianapolis, Russell L. Johnson, Johnson, Gray & MacAbee, Franklin, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Joby D. Jerrells, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BRADFORD, Judge.

Travis Roberson appeals following his guilty plea to Attempted Murder,[1] a Class A felony. Roberson contends that the trial court abused its discretion in waiving him into adult court and that his thirty-eight-year sentence is inappropriate in light of the nature of his offense and his character. We affirm.

## FACTS

On the morning of December 4, 2006, in Jennings County High School, Roberson stabbed L.P. in the neck with the intent to kill him. Roberson, who was dating L.L. at the time, had seen pictures of her and L.P. together on L.L.'s computer and had become angry. As a result of the attack, L.P. was permanently scarred and physically disabled, and he left school. If Roberson's knife had gone any deeper into L.P.'s neck, it likely would have severed an artery, resulting in L.P.'s death. On December 27, 2006, following a hearing, the trial court ordered Roberson waived into adult court. On January 4, 2007, the State charged Roberson with Class A felony attempted murder.

On March 12, 2007, this court denied Roberson's motion to accept jurisdiction of the waiver issue for interlocutory appeal. On March 20, 2007, Roberson filed a notice of his intent to present an insanity defense. Drs. Richard J. Lawlor, J.D., Ph. D., and George Parker, M.D., evaluated Roberson for sanity at the time he stabbed L.P. Both opined that, at the time of the stabbing, Roberson was able to appreciate

---

1. Ind.Code §§ 35–41–5–1(a), 35–42–2–1 (2006).

the wrongfulness of his actions. On June 1, 2007, Roberson moved to withdraw his insanity defense. On July 30, 2007, Roberson pled guilty as charged. On September 18, 2007, after a hearing, the trial court sentenced Roberson to thirty-eight years of incarceration, with three years suspended to probation.

## DISCUSSION AND DECISION

### I. Whether the Trial Court Abused its Discretion in Waiving Roberson into Adult Court

 We need not reach the merits of Roberson's claim that his waiver into adult court was improper. It is well-settled that a defendant may not question pre-trial proceedings following a guilty plea. *See, e.g., McKrill v. State*, 452 N.E.2d 946, 948 (Ind.1983) (concluding, in a case where trial court had not yet ruled on defendant's motion to dismiss when he pled guilty, that "[b]y proceeding without having obtained a ruling on the motion and without protest, the Petitioner waived such ruling."); *Branham v. State*, 813 N.E.2d 809, 811 (Ind.Ct.App.2004) ("A defendant cannot question pre-trial orders after a guilty plea is entered.") (citing *Ford v. State*, 618 N.E.2d 36, 38 (Ind.Ct.App.1993)). In our view, the State's failure to point this out does not change the fact that Roberson gave up the right to bring any claim regarding his waiver into adult court when he pled guilty.

That said, we conclude that the trial court's waiver of Roberson into adult court was nevertheless proper. Indiana Code

section 31–30–3–5 provides as follows, in relevant part:

> Except for those cases in which the juvenile court has no jurisdiction in accordance with IC 31–30–1–4,[2] the court shall, upon motion of the prosecuting attorney and after full investigation and hearing, waive jurisdiction if it finds that:
>
> (1) the child is charged with an act that, if committed by an adult, would be:
>
> (A) a Class A or Class B felony, except a felony defined by IC 35–48–4;
>
> (B) involuntary manslaughter as a Class C felony under IC 35–42–1–4; or
>
> (C) reckless homicide as a Class C felony under IC 35–42–1–5;
>
> (2) there is probable cause to believe that the child has committed the act; and
>
> (3) the child was at least sixteen (16) years of age when the act charged was allegedly committed;
>
> unless it would be in the best interests of the child and of the safety and welfare of the community for the child to remain within the juvenile justice system.

 Where, as here, subsections (1), (2), and (3) of the statute are satisfied, a presumption in favor of waiver arises, and the burden is on the juvenile to present evidence proving that it would be in the best interests of the child and of the safety and welfare of the community for the juvenile to remain within the juvenile justice system. *See Moore v. State*, 723 N.E.2d 442, 446 (Ind.Ct.App.2000). The trial

---

2. In 2007, the Indiana General Assembly amended Indiana Code section 31–30–1–4 to provide that a juvenile court does not have jurisdiction over an individual who is accused of attempted murder if the individual was at least sixteen years of age at the time of the alleged offense, meaning that the case would go directly to the adult docket. *See* P.L. 216–2007, § 35. However, the statutes in effect at the time of Roberson's offense and his waiver hearing left the waiver decision in attempted murder cases to the discretion of the juvenile court. *See* I.C. §§ 31–30–1–4 & –5 (2006).

court determined that Roberson failed to carry that burden and, accordingly, waived him to adult court. We review a juvenile court's decision to waive its jurisdiction for an abuse of discretion. *Id.* at 445. " 'It is for the juvenile court judge, after weighing the effects of retaining or waiving jurisdiction, to determine which is the most desirable alternative.' " *Id.* (quoting *Vance v. State*, 640 N.E.2d 51, 57 (Ind.1994)).

Here, the trial court explicitly found that "remaining in the juvenile justice system is in [Roberson's] best interest." Appellant's App. p. 283. However, the trial court waived Roberson to adult court after noting that "[t]he issue boils down to whether [Roberson] remaining in the juvenile justice system will be in the best interest of the safety and welfare of the community of Jennings County." Appellant's Br. p. 283. Given the serious nature of Roberson's crime, we cannot say that the trial court abused its discretion in this regard. The trial court described Roberson's actions as follows:

8.) Apparently agitated by jealousy over a girl, [Roberson] planned his actions of December 4, 2006. He secured a knife and secretly carried it into a public school building. Although it is not known for sure when [Roberson] began to plan the attack, at the very least, it was the day prior. He was at church on Sunday, December 3, 2006 and no one observed any different or odd behavior. Thus, he had ample time to carefully reflect upon the lethality of his plan and the possible consequences to himself and others. He had sufficient time and opportunity to withdraw from his plan and seek the counsel of a parent, family member, friend, teacher, minister, physician or other person. [Roberson's] actions were not a spur-of-the-moment act of rage, fear, jealousy or retaliation, but a well devised, carefully planned scheme to severely injure or kill another student

inside a public school building during class in the presence of many other students. The planning and carrying out of his plan reflect the ability to think rationally versus some insane or impulsive act.

9.) There is evidence that the injuries to the young man were severe and certainly life-threatening. The victim has not yet returned to Jennings County High School.

Appellant's App. p. 282. In short, Roberson's attack on L.P. was pre-meditated, not done under sudden heat, and it could have easily resulted in L.P.'s death.

In *Daniel v. State*, 582 N.E.2d 364 (Ind. 1991), the Indiana Supreme Court was asked to review the waiver to adult court of a seventeen-year-old boy who was convicted of Class A felony burglary after shooting a high school band director, hitting him with a hammer, and burglarizing the school. The court affirmed the waiver to adult court based on "the viciousness of appellant's attack, the lack of any justification for it, the seriousness of its results, and the relatively mature age, 17, of the juvenile involved." *Id.* at 368. The same can be said about Roberson's attack, except for the fact that Roberson was 16 rather than 17 at the time of his offense. Roberson has failed to persuade us that the trial court abused its discretion by concluding that it would not be in the best interests of the safety and welfare of the community for Roberson to remain within the juvenile justice system.

## II. Whether Roberson's Sentence is Appropriate

■ We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate

Rule 7(B). "Although appellate review of sentences must give due consideration to the trial court's sentence because of the special expertise of the trial bench in making sentencing decisions, Appellate Rule 7(B) is an authorization to revise sentences when certain broad conditions are satisfied." *Shouse v. State,* 849 N.E.2d 650, 660 (Ind.Ct.App.2006), *trans. denied* (citations and quotation marks omitted).

The nature of Roberson's offense was a premeditated and brutal attack that could very well have resulted in L.P.'s death had circumstances been slightly different. The triviality of Roberson's motive in targeting L.P. is almost as alarming as the attack itself: L.P. had been involved with Roberson's then-girlfriend two years beforehand, and Roberson happened upon photographs of the pair on his girlfriend's computer. Moreover, the attack took place in front of approximately sixty or seventy students in school, a place where all of them had a right to feel safe. Following the attacks, the high school felt compelled to invest approximately $33,000 in new security measures. As for L.P., he is permanently scarred and physically disabled, and he left school as a result. We find it worth noting that Roberson's knife nicked an artery in L.P.'s neck, and if the wound had been any deeper, L.P. would almost certainly have died.

As for Roberson's character, the record reveals him to be a remorseless, manipulative, and violent individual. The night before the attack on L.P., Roberson texted a friend that he was "just sitting here ploting [sic] the death of a guy in study hall lol[.]" State's Ex. 1. Shortly thereafter, Roberson asked the same friend, "[W]hat would be cooler .... seeing this kid being set oin [sic] fire or seeing him get his throat slit[?]" State's Ex. 1. Of course, the next morning Roberson did exactly what he said he would do and very nearly killed L.P.

Soon after the attack, Roberson spoke with his mother before participating in an interview with police. We believe that it is worth excerpting the exchange at length for the insight it provides into Roberson's character and his lack of remorse:

[Roberson's mother]: Why did you do it?

[Roberson]: Because I hate him and he deserves to die. I told you I couldn't stand being at school and he was the reason. I sat there shaking behind him the other day and I decided what I was gonna do and I did.

[Roberson's mother]: And you have no remorse for it?

[Roberson]: I don't feel sorry one bit and I would do it again if he was still standing. I would of just made it deeper.

. . . .

[Roberson's mother]: What about his family?

[Roberson]: His family is a bunch of crack addicts. His dad just got out of prison and his mom is a whore.

. . . .

[Roberson's mother]: You can't go around hurting people.

[Roberson]: I don't go around. I can't even make, those jack asses like him deserve to die.

[Roberson's mother]: Nobody deserves to die.

[Roberson]: He deserves to die and I hope that he went to hell. I hope no one ever talked to him about Jesus in his life. That's how remorseful I am.

[Roberson's mother]: He didn't die.

[Roberson]: Well, not yet.

. . . .

[Roberson's mother]: ... You don't think God isn't going to punish you for this?

[Roberson]: Maybe. I'm just trying to stay[ ] out of jail right now. Let's not worry about it.

. . . .

[Roberson's mother]: You have no remorse.

[Roberson]: I just told you that. I just told you that.

Tr. pp. 252–55.

Roberson's version of the incident would soon change, however, demonstrating what we believe to be a conscious attempt to minimize his culpability and manipulate the system. Immediately following the exchange with his mother, Roberson spoke with North Vernon Police Detective Ivory Sandefur as follows:

[Detective Sandefur]: Were you trying to kill him?

[Roberson]: Well, I don't know. I wanted him to bleed a lot. That was my thought when I was doing it.

. . . .

[Detective Sandefur]: ... How do you feel now that you have done it?

[Roberson]: Um I don't feel sorry for him, but I feel stupid because now I'm going to get in trouble and I really don't want to go to jail at all.

Tr. pp. 256, 260.

Roberson's story would change again, into narratives further minimizing his culpability. On April 9, 2007, Dr. Lawlor interviewed Roberson in connection with Roberson's notice of insanity defense. When asked to describe the attack, Roberson told Dr. Lawlor that "around the time that he [stabbed L.P.], it seemed like he was in slow motion, and he could see himself doing it, as if he was making a movie." Appellant's App. p. 341. In this interview, Roberson claimed that he had begun to regret his actions after fleeing the school but before police had apprehended him, even claiming that he had not wanted to face his grandmother for fear of what she would think of him. Roberson told Dr. Lawlor that his mother had arrived at the police station crying shortly after his arrest, and that "he then just sat there and was thinking, 'Oh my God, why did I do that, that was so stupid.'"[3] Appellant's App. p. 342. In our view, Roberson's changing story is more consistent with attempting to evade responsibility than with true remorse.

The record is replete with additional indications that Roberson is manipulative and something of a chameleon, willing and able to say or do whatever is necessary to advance his own interest, which, at this point, is primarily to be released from prison sooner rather than later. In February of 2005, Dr. Stephanie L. Scifres, Ph.D., H.S.P.P., noted Roberson's "manipulations of both parents, attention seeking behaviors, and his lack of remorse for harm to others." State's Ex. 12. Changes to Roberson's "myspace" page reflect his manipulative nature and his tendency to change his tune, depending on who is listening. On December 6, 2006, two days after the attack on L.P., Roberson's page still listed his "motto" as "Easy mutha f* * * * * E" and listed "anyone that has been in prison" and "coke heads and her-

---

3. Dr. Parker also evaluated Roberson's sanity at the time of the attack and interviewed him on April 11, 2007. Roberson told Dr. Parker that his "memory of the incident was 'all blurred together' and said that 'it's like I was out of my body, watching.'" Appellant's App. p. 351. Roberson told Dr. Parker also that he did not want to face his grandmother and that the realization of what he had done caused him "significant anxiety." Appellant's App. p. 351.

oin addicts" as "Heroes[.]" State's Ex. 14. Within two months, the page had changed considerably, with the motto now reading "I LOVE HER[,]" listing "God" as the first among those he would like to meet, listing the Bible as the first one of his "Books[,]" and listing Jesus as the first among his "Heroes[.]" State's Ex. 15. The glowing testimony concerning Roberson's character from his grandparents, his minister, and his uncle, among others (all of whom claimed to have been shocked by his attack on L.P.), is further proof of his ability and willingness to manipulate those around him.

We are also gravely concerned with Roberson's history of violence. In late 2004 and mid–2006, Roberson struck his father in the face. Some time before the attack on L.P., during an apparent confrontation with a person who was dropping Roberson's girlfriend off at Roberson's house, Roberson displayed a twelve-gauge shotgun. On November 1, 2006, approximately a month before the attack on L.P., Roberson "accosted" another student at school, apparently for simply walking next to his ex-girlfriend. Tr. p. 188. Afterward, Roberson openly boasted of the attack in several text message exchanges with friends. In one message, Roberson explained that "lol.. yeah .... the lil b* * * * gave me a sh* * * * mexican look so i was like its on now u spick[.]" State's Ex. 4. Roberson also told one of his teachers that the suspension he received for the attack was "all worth it because [he] got her back." Tr. p. 203. Following the attack on L.P., while Roberson was out on bail in April of 2007, Roberson engaged in a conflict with B.C., who was dating his

former girlfriend at the time. At one point, Roberson threatened to kill B.C. and his family, and came to B.C.'s house at approximately 1:30 a.m. one morning. Roberson left when confronted by the armed B.C. and B.C.'s mother.[4]

We are not unaware of Roberson's history of mental illness and acknowledge that there may well be a nexus between his illnesses and his crimes. In this case, however, we cannot bring ourselves to reduce Roberson's sentence on the basis that his violent nature may not be entirely within his control. We consider Roberson to pose a high risk of harm to others, and we cannot therefore endorse a reduction in his sentence under the circumstances.

The judgment of the trial court is affirmed.

BAILEY, J., concurs.

RILEY, J., concurs in part and dissents in part with separate opinion.

RILEY, Judge, concurring in part and dissenting in part with separate opinion.

I concur in part and dissent in part. I agree with the majority that the trial court did not abuse its discretion by waiving Roberson to its adult docket. However, I believe that Roberson's thirty-eight-year sentence is inappropriate in light of his youth and his well-documented history of mental health problems.

I acknowledge that the nature of Roberson's offense was disturbing. He planned a potentially-fatal attack on a classmate and executed that plan during school hours, in front of other students. Regard-

---

4. This incident caused Dr. Parker to reconsider his earlier conclusion that Roberson had no history of violence other than shortly after he stopped taking Wellbutrin. As Dr. Parker noted, this confrontation occurred well after Roberson had started taking Depakote and no longer had any Wellbutrin in his system. In addition, Dr. Lawlor opined that "[i]t would not be my impression or opinion that the Wellbutrin played a significant role in causing [Roberson] to commit the act that he did." Appellant's App. p. 69.

ing Roberson's character, the attack that gave rise to this case was preceded by an earlier suspension from school for fighting, and Roberson allegedly threatened the lives of another boy and his family while this case was pending. Still, several considerations leave me convinced that a thirty-eight-year sentence is unduly harsh.

The majority writes, "We are not unaware of Roberson's history of mental illness and acknowledge that there may well be a nexus between his illnesses and his crimes." Op. at 452. For the most part, however, the majority disregards the actual extent of Roberson's history of mental illness. Because I believe that history is relevant to the appropriateness of Roberson's sentence, I summarize it here.

Roberson, who was born on October 22, 1990, had a tumultuous relationship with his father, a drug and alcohol user who had spent time in prison and who divorced Roberson's mother in 2001. Roberson first received mental health treatment in 2000, at the age of nine. He has a history of cutting himself. At the age of thirteen, Roberson ran away from home and was alleged to be a delinquent child, a charge that was later dropped. In 2005, Roberson tried to hang himself with a belt. When his mother stopped him, he tried to cut himself with a CD. After that incident, Roberson spent eight days in the hospital. Then, on October 12, 2006, Roberson, apparently upset by the possibility that his father would be going back to prison, cut himself and swallowed a large number of Tylenol in an effort to commit suicide. Even though Roberson was only fifteen years old at the time, he was prescribed Wellbutrin XL, which "is approved only for adults 18 years and over." (Defendant's Ex. 3). Roberson was not prescribed Wellbutrin by a psychiatrist, and while he was on it, he was not under the supervision of a psychiatrist. "He was

therefore not aware of the side effects of this medication, nor of the possible consequences of suddenly discontinuing medication, which include outbursts of anger." (Appellant's App. p. 63).

In late October of 2006, Roberson stopped taking Wellbutrin without being instructed to do so by a doctor. On November 1, 2006, Roberson was suspended from school for fighting with another student. According to Roberson's mother, Roberson had never been aggressive or violent until he started taking Wellbutrin. As such, while he resumed taking Wellbutrin, his mother set an appointment for November 30, 2006, to determine whether Roberson should have his medication adjusted. However, on the day of the appointment, Roberson was sick, so his mother cancelled the appointment. In early December, without having seen a doctor, Roberson again stopped taking Wellbutrin.

From this information, I gather the following. First, other than an allegation that he was a runaway in 2004, when he was thirteen years old, Roberson has had no other involvement with the adult or juvenile court systems.

Second, Roberson was only a month-and-a-half past his sixteenth birthday when he committed his offense. If he had committed his crime two months earlier, at the age of fifteen, chances are good that he would have been prosecuted as a juvenile and faced a significantly shorter sentence. The majority never once mentions Roberson's age in its sentencing discussion. Just because Roberson was waived into adult court does not mean that he should have been treated like any other adult for purposes of sentencing, but that is the precise effect of the majority opinion.

Third, while the exact role that Roberson's mental illness played in his attack on L.P. is in dispute, there is no question

that, as Dr. Lawlor put it, Roberson "clearly has a long history of mental illness, with diagnoses including major depressive disorder, oppositional defiant disorder, bipolar disorder, and borderline personality disorder." (Appellant's App. p. 343). Furthermore, while the doctors disagree as to whether Roberson's use of Wellbutrin contributed to the attack, there is no dispute that Wellbutrin is approved only for adults eighteen years and over, that Roberson was not prescribed Wellbutrin by a psychiatrist, that he was not under the supervision of a psychiatrist while he was on it, and that he was therefore unaware of the side effects and of the possible consequences of suddenly discontinuing the medication. As his mother testified, he was never a violent person until he started taking Wellbutrin.

To be sure, Roberson still has significant issues to address. The majority correctly points out that Roberson has shown himself to be manipulative and that he has engaged in violent behavior on other occasions. His confrontation with B.C. while this case was pending indicates that he still has the potential to be a dangerous person and that a significant prison term is in the best interest of the safety and welfare of the public. But given Roberson's young age at the time of the attack, his lack of criminal history, and his long and documented history of mental illness and family problems, I believe that thirty-eight years is simply too much. Roberson was a kid at the time of his attack on L.P. A kid with a drug-using father who has been in and out of jail himself. A kid who had been prescribed an adult medication at the age of fifteen with only spotty supervision. I do not mean to excuse Roberson's actions; I merely hope to put them in their proper context.

With a thirty-eight-year sentence, even if Roberson were to behave while incarcerated and earn good time credit, he would still serve almost twenty years in prison. If, on the other hand, we were to reduce Roberson's sentence to the still-significant minimum term of twenty years, he could potentially be released from prison closer to the age of twenty-five. Roberson is eighteen today, and his life's path is still undecided. There is something to be said for brightening the light at the end of the tunnel. In short, I do not believe that Roberson is a lost cause. I would remand this cause to the trial court with instructions to reduce Roberson's sentence to twenty-three years, with twenty years executed and three years suspended to probation. Therefore, I respectfully dissent.