Nevin **BROOKS**, Appellant–Defendant,

v.

**STATE of Indiana**, Appellee–Plaintiff.

No. 49A04–0911–CR–651.

Court of Appeals of Indiana.

Oct. 5, 2010.

---

Victoria L. Bailey, Marion County Public Defender Agency, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARTEAU, Senior Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Nevin Brooks appeals his conviction of and sentence for felony murder.[1] We affirm.

### ISSUES

Brooks raises six issues for our review, which we restate as:

I.  Whether the juvenile court abused its discretion in waiving jurisdiction over Brooks.

II. Whether the admission of evidence obtained through a pat down search was proper under the Fourth Amendment.

III. Whether the admission of evidence obtained through a pat down search was proper under Article I, Section 11 of the Indiana Constitution.

IV. Whether the trial court erred in denying Brooks' motion for mistrial.

V.  Whether the State presented sufficient evidence to support the conviction.

VI. Whether the sentence imposed was inappropriate.

### FACTS AND PROCEDURAL HISTORY

On March 16, 2008, at approximately 10 p.m., David Hardwick was shot in the head and mortally wounded during a robbery. A police investigation disclosed that Hardwick had been shot at close range while on his knees and that his body had been turned over as it lay on the ground. Hardwick's wallet, watch, and bracelet were not found on his person.

Approximately two miles from the crime scene, a young African–American male was caught on surveillance video attempting to use Hardwick's ATM card at a machine located in a service station. This person, later identified as fourteen-year-old Brooks, arrived at the service station in a white car containing at least two other individuals. Brooks' attempts to use Hardwick's card occurred approximately twenty minutes after Hardwick's death.

Two days later, Lawrence Police Officer Tracey Cantrell responded to a dispatch that described an armed robbery at a Lawrence apartment complex. The dispatch included a description of the suspect, particularly the suspect's jacket and clothing, and the direction in which the suspect had fled. Officer Cantrell, who was near the crime scene, observed a person who matched the description given by dispatch

---

1.  Brooks was charged with and convicted of murder, felony murder, and robbery. The trial court merged the convictions and sentenced Brooks on the felony murder conviction.

talking with the apartment complex maintenance man. Officer Cantrell approached the person, later identified as Brooks, and asked to speak with him. Suspecting that Brooks might be armed, Officer Cantrell performed a pat down search before speaking with him. During this pat down search, Officer Cantrell felt what he immediately identified as bullets. Officer Cantrell removed the bullets from Brooks because he was concerned that Brooks might have the gun on his person or might have hidden the gun nearby. After removing the bullets from Brooks, Officer Cantrell handcuffed him and continued the search, still looking for a weapon. Another Lawrence officer arrived at the scene with the victim of the armed robbery, and the victim identified Brooks as the one who pointed a gun at him while robbing him of cash. Brooks was then arrested for the armed robbery and was transported to the police station.

Brooks was subsequently identified as the person in the service station surveillance tapes by both a police officer and Brooks' mother. Forensic testing on Hardwick's skull and the confiscated bullets disclosed that the .38 caliber special light weight bullets had the same uncommon characteristics and morphology as the bullet recovered from Hardwick's skull.

The State filed a delinquency petition in juvenile court, alleging that Brooks had committed acts of murder, felony murder, and robbery. The State also filed a petition to waive jurisdiction over Brooks to adult court. After a hearing on the waiver petition, the juvenile court ordered waiver. After waiver and a subsequent hearing on Brooks' motion to suppress the bullets, the trial court denied the motion to suppress. The trial court also denied Brooks' motion for mistrial during the trial. As noted above, Brooks was found guilty on all three counts, with the trial court merging the convictions at sentencing. Brooks was sentenced to the advisory sentence of fifty-five years. He now appeals.

## DISCUSSION AND DECISION

### I. WAIVER

■ Brooks contends that the juvenile court abused its discretion when it waived him into adult court. He argues that the juvenile court neglected to make sufficient findings on the issue of whether waiver was in his best interest or the best interests of the safety and welfare of the community. He further argues that he presented sufficient evidence to show that waiver was not in his or the community's best interest. Brooks also contends that under the current standard of review, this Court is unable to conduct a meaningful review of the juvenile court's order, resulting in the loss of opportunity for a constitutionally meaningful review.

Ind.Code § 31–30–3–4 provides:

Upon motion of the prosecuting attorney and after full investigation and hearing, the juvenile court may waive jurisdiction if it finds that:

(1) the child is charged with an act that would be murder if committed by an adult;

(2) there is probable cause to believe that the child has committed the act; and

(3) the child was at least ten (10) years of age when the act charged was allegedly committed;

unless it would be in the best interests of the child and the safety and welfare of the community for the child to remain within the juvenile justice system.

■ We review a juvenile court's decision to waive jurisdiction only for an abuse of discretion. *Moore v. State,* 723 N.E.2d 442, 445 (Ind.Ct.App.2000). It is for the juvenile court judge, after weighing

the effect of retaining or waiving jurisdiction, to determine which is the more desirable alternative. *Id.* It is well-settled that in reviewing a sufficiency claim, appellate courts will neither weigh the evidence nor judge the credibility of the witnesses "but rather will consider that evidence most favorable to the State with all reasonable inferences therefrom." *McDowell v. State,* 456 N.E.2d 713, 715 (Ind.1983). The record of the waiver hearing may be used to supplement the juvenile court's conclusion. *Smith v. State,* 459 N.E.2d 355, 360 (Ind. 1983).

In the present case, the juvenile court made extensive findings on the first three elements above. However, with regard to the best interests of Brooks and the community, the juvenile court merely concluded that it had "not found from the evidence that it would be in the best interest of the child and the safety and welfare of the community for him to remain within the juvenile justice system." (Appellant's App. at 42).

In the interest of judicial economy, the expected practice is for the juvenile court to make specific findings to support its conclusion. However, our supreme court has held that the lack of such findings does not invalidate the order "if the record contains sufficient facts for the court to find that waiver is appropriate." *Vance v. State,* 640 N.E.2d 51, 57 (Ind.1994). The court then reviewed the record and affirmed the juvenile court. *Id.* We will follow our supreme court's lead and review the record to ascertain whether it contains sufficient facts to support the juvenile court's order.

Our review of the record discloses that a large group of senior probation staff conferred on the question of waiver and determined that it was in the best interests of the community that Brooks be waived. The witness for the probation department explained that the group determined that if Brooks were to remain in the juvenile system he would have to be released at age twenty-one into a culture where he had no supervision or essential services. The witness further explained that there was a "good chance" that Brooks would reoffend. (Tr. at 940). In addition, the record discloses that Brooks has had prior encounters with the juvenile justice system, and those encounters failed to deter his criminal behavior; indeed, instead of reforming, Brooks engaged in far more serious criminal actions than before his contact with the system. The record discloses that probation workers considered Brooks to be beyond rehabilitation by the local juvenile justice system. Furthermore, it is evident from the record that the community's best interests are not served by the release at age twenty-one of a juvenile who engaged in robbing and killing an innocent citizen.

Brooks had a number of witnesses testify that it would be in his best interest to continue in the juvenile system. One of these witnesses, a psychiatrist, admitted that Brooks had fooled others into believing that he was reformed. The psychiatrist testified that she did not like what Brooks would learn at a secure facility, but she admitted that a secure facility would protect the community from Brooks' violence.

Another witness, a professor, testified about a study showing that fewer offenders kept in the juvenile justice system reoffended than those waived into the adult system. However, the study did not include juveniles who had committed murder.

Other witnesses, including those from the non-profit entity Boys Town, testified that Brooks could be treated in the juvenile system, but they admitted that they could not predict with certainty that

Brooks would not ultimately be a serious danger to the community.

The record shows that the ability of the juvenile system to rehabilitate Brooks is questionable, and the risk to the community of leaving him in the juvenile system is unquestioned. Accordingly, we conclude that the trial court did not abuse its discretion in waiving Brooks to the adult system.

With reference to Brooks' contention that our standard of review deprives juveniles of constitutionally meaningful review, we first observe that our supreme court has endorsed the standard that a reviewing court should look only at the evidence in favor of the juvenile court's order. See e.g., *Smith,* 459 N.E.2d at 360; *McDowell,* 456 N.E.2d at 715. We do not possess the authority to change the standard. Furthermore, we note that in both *Hall v. State,* 870 N.E.2d 449, 455–57 (Ind.Ct.App. 2007), *trans. denied,* and the instant case, we have reviewed the testimony of the juvenile's witnesses in an effort to understand the court's order.[2] Clearly, there is no lack of meaningful review under these circumstances.

## II. ADMISSION OF EVIDENCE: FOURTH AMENDMENT

■ Brooks contends that the trial court abused its discretion in admitting as evidence the bullets discovered during the pat down search. Brooks argued that Officer Cantrell did not have reasonable suspicion to believe that Brooks was engaging or had engaged in any wrongdoing. Specifically, Brooks argues that there was no evidence to indicate that the description given to Officer Cantrell came from a specific source, and he claims that the description given to Officer Cantrell was too vague.

■ Trial courts have broad discretion when ruling on the admissibility of evidence. *Harris v. State,* 878 N.E.2d 534, 537 (Ind.Ct.App.2007), *trans. denied.* The trial court's determination is therefore reviewed for an abuse of discretion, which occurs when the trial court's determination is clearly against the logic and effect of the facts and circumstances before the court. *Merchant v. State,* 926 N.E.2d 1058, 1061 (Ind.Ct.App.2010). In reviewing a ruling on the admissibility of evidence, as is the situation here, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling, although we must also consider any uncontested evidence favorable to the defendant. *A.M. v. State,* 891 N.E.2d 146, 149 (Ind.Ct.App.2008), *trans denied.*

■ The Fourth Amendment to the United States Constitution, which protects an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures, is applicable to the states by way of the Due Process Clause of the amendment. *Harper v. State,* 922 N.E.2d 75, 79 (Ind.Ct.App.2010), trans. denied. In general, the Fourth Amendment requires a warrant, based on probable cause, in order for the police to search or seize an individual; however, there are some well-delineated exceptions to the warrant requirement. *Washington v. State,* 922 N.E.2d 109, 111 (Ind.Ct.App. 2010). Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or seizure. *Merchant,* 926 N.E.2d at 1062. One well-recognized exception to the warrant requirement is that of a *Terry* stop.[3] *Washington, id.*

---

2. Brooks relies heavily on *Hall* to make his point about meaningful review.

3. See *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ Under a *Terry* stop, a police officer, without probable cause, is permitted to stop and briefly detain an individual for investigative purposes, but only if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. *Armfield v. State*, 918 N.E.2d 316, 319 (Ind.2009). A *Terry* stop permits the officer to temporarily freeze the situation for inquiry but does not afford an officer the authority attendant to an arrest. *Harper*, 922 N.E.2d at 79. A trial court's determination that the officer had reasonable suspicion for the stop is reviewed *de novo*, but due weight is given to inferences drawn from the facts by the trial court. *Armfield*, 918 N.E.2d at 319. Moreover, when making our determination regarding reasonable suspicion, we consider the totality of the circumstances of the case in order to determine whether the officer had a particularized and objective basis for suspecting wrongdoing by the person being stopped. *Id.* Reasonable suspicion is an abstract concept that is not readily reduced to a neat set of rules; however, the reasonable suspicion requirement is satisfied where "the facts known to the officer, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe criminal activity has occurred or is about to occur." *L.W. v. State*, 926 N.E.2d 52, 55 (Ind.Ct.App. 2010).

Brooks cites *L.W.* in support of his claim that there was no evidence given to indicate that the description of the suspect came from a reliable source. In *L.W.*, a panel of this court concluded that "the dispositive question is whether the tip [from a caller] provided to police was sufficient to support an investigatory stop of L.W." *Id.* at 55. In finding the caller's tip inadequate, the panel noted that "there is no evidence in the record that law enforcement had verified [the caller's] identity or that his reliability was known prior to the investigatory stop of L.W. On this record, while [the caller] identified himself, he was nonetheless a virtual stranger." *Id.* at 57. The panel further observed that neither the officer who stopped L.W. nor the police department knew whether the caller was "a concerned citizen, a prankster, or an imposter." *Id.* (citing *State v. Glass*, 769 N.E.2d 639, 643 (Ind.Ct.App.2002), *trans. denied* ). The panel concluded that the officer who stopped L.W. did not have reasonable suspicion at the time of the stop. *Id.* at 59–60.

Our review of the record in this case discloses that Officer Cantrell did not rely on a tip from an unreliable caller. The suppression hearing transcript shows that the dispatch "initially came out [as] an assault while armed but as soon as the [investigating] officers arrived they clarified it actually was an armed robbery with assault." (Tr. at 26). After disagreement between the parties on the particulars of the stop and search, Officer Cantrell was called to the stand and the following testimony was given on direct examination:

Q. What was the initial nature [of the dispatch]?

A. It was a person that was assaulted, possibly with a weapon.

Q. Okay. Now, upon arrival did you receive any additional information?

A. Yes, sir.

Q. And who did you receive that information from?

A. Dispatch.

Q. And was that information being provided by other officers that were at the same location?

A. Yes, sir.

Q. And as a police officer, do you rely on the information provided to you by other law enforcement officers?

A. Yes, sir.

Q. Did you have occasion to see an individual who matched the description that had been called out as the possible suspect in this assault with a gun and later an armed robbery?

A. Yes, sir.

(Tr. at 33). After Officer Cantrell completed his testimony, Brooks offered the "Probable Cause Affidavit" as evidence, and it was admitted without objection. The affidavit indicates that a juvenile, later identified by the victim as Brooks, robbed the victim of $100 while pointing a gun at the victim. Brooks then hit the victim on the head, causing a large laceration and bleeding. The affidavit further provides that two officers arrived at the scene and were told by an eyewitness that a person wearing a black coat with a logo on the back had committed the robbery and that he had run in an easterly direction when the driver of the getaway car left without him. (Appellant's App. at 116).

It is clear from Officer Cantrell's testimony that the dispatcher was provided with a description by the investigating officers at the scene of the robbery who had talked to an eyewitness to the armed robbery. Thus, *L.W.* is inapposite.

Brooks' contention about the lack of specificity of the description given to Officer Cantrell is intertwined with his argument about the allegedly unknown identity of the informer. However, Brooks does mention that relevant factors in assessing reasonable suspicion include the specificity of the description of the suspect, the number of people in the area, the location of the person stopped, and the nearness of the stop to the crime. See *U.S. v. Broomfield,* 417 F.3d 654, 655 (7th Cir.2005).

Here, unlike in *L.W.* where the description came from a caller whose identity was unverified and whose description was limited to "a tall black male wearing [a] black shirt and black shoes," the description came from an eyewitness who described a black male wearing a dark coat with a "huge logo on the back, a hat, and pants." (Tr. at 327). Exhibits in the record show that Brooks was attired in the manner described.[4] Furthermore, Brooks was stopped near the scene of the crime and close in time to the armed robbery. There is no indication that Brooks could have been mistaken for someone in a large group of people, as only he and the maintenance man were present at the time of the stop. Under the circumstances of this case, the description was sufficient and the stop was warranted.

## III. ADMISSION OF EVIDENCE: THE INDIANA CONSTITUTION

■ Brooks contends that the trial court erred in admitting the bullets found in Brooks' pocket when Officer Cantrell, who engaged in the pat down search, acted unreasonably under the totality of the circumstances pursuant to Article I, Section 11 of the Indiana Constitution. The legality of a governmental search under our constitution "turns on an evaluation of the reasonableness of police conduct under the totality of the circumstances." *Webster v. State,* 908 N.E.2d 289, 292 (Ind.Ct.App. 2009), *trans. denied.* The burden is on the State to show reasonableness, and in evaluating reasonableness we look at the following non-exclusive factors: (1) the de-

---

4. Brooks mentions that Officer Cantrell originally testified that the logo was of a dragon but later testified only that it was a large logo. We note that Officer Cantrell was testifying at least a year after the stop and that the probable cause affidavit identifies the eyewitness as stating that Brooks was wearing a black coat with a logo on the back. The trial exhibits show that the large, colorful logo on the black coat was of the cartoon character "Yosemite Sam" with guns blazing.

gree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.*

Here, Officer Cantrell received a dispatch containing information gleaned from an eyewitness to an armed robbery. The information included a description of a black male who had run in an easterly direction from the crime scene and who was wearing a black coat with a huge logo on the back, a hat, and pants. Officer Cantrell obviously had a high degree of concern about an armed suspect in the area, and he immediately became suspicious of Brooks because of the eyewitness' description of the person who committed the armed robbery. Initially, the degree of intrusion into Brooks' ordinary activities included only a pat down search. The intrusion became greater after the discovery of the bullets, as Officer Cantrell then handcuffed Brooks. The intrusion, however, was necessitated by Officer Cantrell's concern that a weapon was nearby and that both officers and civilians were in danger. Under the totality of the circumstances, we cannot say that Officer Cantrell's actions were unreasonable.

## IV. DENIAL OF MOTION FOR MISTRIAL

Brooks contends that the trial court erred in not granting his motion for mistrial when Officer Cantrell allegedly testified regarding inadmissible Indiana Rule of Evidence 404(b) evidence. Rule 404(b) states in relevant part that "[e]vidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, plan, knowledge, identity,

or absence of mistake or accident...." Brooks argues that although the parties stipulated to and the trial court gave an admonishment to the jury, the admonishment was insufficient to cure the harm from the testimony.

A mistrial is an extreme remedy granted only when no other method can rectify the situation. *Booher v. State,* 773 N.E.2d 814, 820 (Ind.2002). A trial court's decision not to grant a mistrial is reviewed for an abuse of discretion. *Stokes v. State,* 919 N.E.2d 1240, 1243 (Ind.Ct.App.2010), *trans. denied.* Moreover, a reviewing court accords great deference to the trial court's ruling on a mistrial motion. *Treadway v. State,* 924 N.E.2d 621, 628 (Ind. 2010). In determining whether a mistrial was warranted, we consider whether the defendant "was placed in a position of grave peril to which he should not have been subjected." *Leach v. State,* 699 N.E.2d 641, 644 (Ind.1998). The gravity of the peril is determined by "the probable persuasive effect on the jury's decision." *Id.* When a motion for mistrial has been denied, the defendant has the burden to demonstrate both that he was placed in a position of grave peril to which he should not have been subjected and that no other remedy can cure the perilous situation in which he was placed. *Stokes, id.*

Here, the State attempted in its case in chief to establish the foundation for the admission of the bullets found by Officer Cantrell in the pat down search without revealing that Officer Cantrell and other officers sought Brooks for the armed robbery of a victim only two nights after the murder of Hardwick. The deputy prosecutor asked Officer Cantrell whether a dispatch had given him a description "of anybody in particular that was of interest to you?" (Tr. at 327). Without objection, Officer Cantrell answered in the affirmative. Officer Cantrell then testified to the

direction taken by this person of interest. (Tr. 329). It was only when the deputy prosecutor asked what Officer Cantrell did when he saw the person of interest that Brooks' attorney objected, out of the hearing of the jury, on the basis that "it's apparent to the jury that this is an arrest of some sort...." (Tr. at 330). Brooks' attorney also noted that Brooks had agreed that the State would testify only that Brooks "had an encounter with police." (Tr. 329). Brooks' attorney later asked for a mistrial after further questions by the deputy prosecutor and answers from Officer Cantrell. Brooks' attorney did not contemporaneously object to the questions or answers.

We initially observe that the majority of the evidence pertinent to the mistrial motion came in without objection. Accordingly, any issue on appeal is waived. See *Hale v. State,* 875 N.E.2d 438, 444 (Ind.Ct. App.2007), *trans. denied.* We further observe that the following admonishment, agreed upon by both Brooks' attorney and the deputy prosecutor, was given to the jury after the testimony of other officers:

> You heard testimony from Officer Cantrell and Officer Newlon yesterday and Detective Zentz today. Their testimony included references to an event that occurred on March 18, 2008, at or near Pinnacle Square Apartments. This testimony is not to be used to infer or speculate as to whether Mr. Brooks was actually involved in any improper or illegal activity. You shall only consider Officer Cantrell's and Officer Newlon's testimony for the sole purpose for which it was introduced, that was to establish that during contact with Mr. Brooks, Officer Cantrell found bullets in Mr.

Brooks' pocket and Officer Newlon retained and transported these bullets. The basis for Officer Cantrell's dispatch on that day or whether Mr. Brooks was in any way involved in or related to any activity that led to that dispatch is not relevant. Speculation about Officer Cantrell's contact with Mr. Brooks should not factor into the jury's deliberation or decision in this case.

(Tr. 466; State's Ex. 44–C).

■ A timely and accurate admonishment is presumed to cure any error in the admission of evidence. *Boner v. State,* 796 N.E.2d 1249, 1252 (Ind.Ct.App.2003). Brooks now argues that the admonishment was neither timely nor accurate. Although the admonishment was not given immediately after Officer Cantrell's testimony, it is not untimely under the circumstances of this case. Brooks' attorney did not ask for an admonishment until the end of Officer Cantrell's and Officer Newlon's testimonies, and then only upon a suggestion by the deputy prosecutor. Brooks cannot now complain about an untimely admonishment.[5] Furthermore, Brooks cannot now complain about the contents of an admonishment that his attorney drafted in part and acceded to at trial. Indeed, the admonishment appears to cure any error occurring during the testimonies of the officers. The testimonies did not specifically identify Brooks as a suspect of another crime, and the admonishment negated any conclusion that the testimonies were intended to imply involvement in another crime. In short, Brooks was not placed in grave peril, and the trial court did not abuse its discretion when it denied Brooks' motion for mistrial.

---

**5.** The timing of the admonishment was somewhat controlled by the trial court's desire to let Brooks' attorney address the motion for mistrial at the end of the day on which Officers Cantrell and Newlon testified. However, at the time that the court stated its desire, Brooks had not asked for an admonishment or indicated that he was going to ask.

## V. SUFFICIENCY OF THE EVIDENCE

Brooks contends that without the admission of the bullets, the evidence against him is insufficient. As discussed in Sections II and III of this opinion, the bullets were properly admitted. Brooks' contention is therefore of no moment.

## VI. INAPPROPRIATE SENTENCE

■■■■■ Brooks contends that although he committed a "horrible and senseless crime," the advisory sentence imposed by the trial court is inappropriate when balanced against who he was when he was sentenced. The revision of a sentence is authorized by Indiana Appellate Rule 7(B), which provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In determining the appropriateness of a sentence, a court of review may consider any factors appearing in the record. *Schumann v. State,* 900 N.E.2d 495, 497 (Ind.Ct.App.2009). The "nature of the offense" portion of the appropriateness review begins with the advisory sentence. *Anglemyer v. State,* 868 N.E.2d 482, 491 (Ind.2007), *clarified on rehearing,* 875 N.E.2d 218 (Ind.2007); *Richardson v. State,* 906 N.E.2d 241, 247 (Ind.Ct.App. 2009). The "character of the offender" portion of the sentence review refers to general sentencing considerations and the relevant aggravating and mitigating circumstances. *Major v. State,* 873 N.E.2d 1120, 1130 (Ind.Ct.App.2007), *trans. denied.* A defendant bears the burden of persuading us that his sentence is inappropriate. *Id.* at 1131.

In summary, Brooks contends that we should find his sentence inappropriate because (1) there were other people involved in the murder and the jury may have found him guilty as an accomplice with minimal involvement in the crime; (2) there was very little positive parental involvement in his life; and (3) there is an argument that he remains a child and that he has behaved very well when placed in a secure but nurturing environment.

With reference to the nature of the offense, we note that there is no evidence that Brooks had only minimal involvement in the robbery and murder of Hardwick. Indeed, when Brooks was arrested two days after the robbery and murder, he had just attempted an armed robbery, and he was carrying the bullets that had the same uncommon characteristics and morphology as the bullet recovered from Hardwick's skull. We cannot conclude that Brooks just happened to be at the scene of Hardwick's senseless killing.

With reference to the character of the offender, we agree that Brooks had a very poor upbringing. However, growing up in poverty without parental guidance is unfortunately not a rarity, and we do not consider it to be a factor that would cause us to deem an advisory sentence inappropriate. Not everyone who grows up in such an unfortunate environment channels his anger into robbery and murder. Moreover, Brooks' positive behavior in the restricted environment of Boys Town demonstrates that he knows right from wrong and that he can make good choices, at least when it suits his purposes. Brooks' actions on the night of March 16, 2008, betrayed everything he supposedly learned while in a restricted environment.

We note that the trial court considered Brooks' age in fashioning the sentence imposed. The court also considered Brooks' criminal history. He is not a little boy who can be trusted to mend his erring ways; he is a hardened individual who, in the midst of committing a series of crimes,

robbed and murdered a random victim. Given the nature of the offense and the character of the offender, we cannot conclude that the sentence imposed by the trial court is inappropriate.

Affirmed.

FRIEDLANDER, J., and ROBB, J., concur.