**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jul 17 2012, 9:14 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DAVID M. ZENT**
LEONARD, HAMMOND, THOMA
& TERRILL
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

LARRY C. PERRY, JR., )
 )
 Appellant-Defendant, )
 )
 vs. )    No.  02A05-1112-CR-635
 )
STATE OF INDIANA, )
 )
 Appellee-Plaintiff. )

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D05-1106-FD-890

**July 17, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Larry C. Perry, Jr., appeals his convictions for Criminal Confinement,[1] a class D felony; Strangulation,[2] a class D felony; two counts of Domestic Battery,[3] a class D felony; Residential entry,[4] a class D felony; Invasion of Privacy,[5] a class D felony; Interference with the Reporting of a Crime,[6] a class A misdemeanor; Resisting Law Enforcement,[7] a class A misdemeanor and his adjudication as a Habitual Offender.[8] Specifically, Perry argues that the trial court erred by denying his motion for a mistrial because the jurors saw the prosecutor's notes from closing argument during the deliberations. Finding no error, we affirm the judgment of the trial court.

FACTS

Samantha Lee lived with her five-year-old daughter and three-year-old son in Fort Wayne. On June 21, 2011, Samantha spent most of the day outside with her children while they rode their bicycles. Around 10:00 p.m., Samantha and the children went inside and began to watch a movie in the living room. Samantha went into her bedroom

---

[1] Ind. Code § 35-42-3-3.

[2] I.C. § 35-42-2-9.

[3] I.C. § 35-42-2-1.3.

[4] Ind. Code § 35-43-2-1.5.

[5] Ind. Code § 35-46-1-15.1.

[6] Ind. Code § 35-45-2-5.

[7] Ind. Code § 35-44-3-3.

[8] Ind. Code § 35-50-2-8.

to retrieve blankets and pillows so that she could sleep in the living room with the children because she "had a bad feeling." Tr. p. 68. At some point, Perry, her ex-husband, appeared from one of the closets. Samantha had an active no contact order against Perry at the time.[9] Samantha ran to the living room and attempted to call the police. Perry followed her, ripping the phone off of the wall. While Perry argued and yelled at Samantha, she repeatedly attempted to dial 911 on a cellular telephone.

During Samantha's 911 calls, she told Perry to stop. She pleaded with him to let her leave the home on five separate occasions. While Samantha attempted to contact the police, Perry broke Samantha's laptop computer. When the police did not arrive after fifteen minutes, Samantha stated her address over the phone. Perry took the cellular phone from Samantha, and "like bit it and threw it." Tr. p. 71. Perry then struck Samantha in the ear with his fist. He also "had [Samantha's] head just banging on the floor." Id. at 72. Samantha's two children were still in the living room and witnessed Perry striking their mother. Samantha tried to escape but was unable to do so. Perry made Samantha go into a guest bedroom and began apologizing to her. Perry would not allow Samantha to exit the room, so Samantha's daughter retrieved ice for her mother's injured ear. Samantha was eventually able to fall asleep. Samantha had a swollen ear for two weeks, and her hearing was impacted for a month. Tr. p. 77-78; State Ex. 9-10, 18-19.

---

[9] The record is unclear as to when the no contact order became effective or the exact circumstances that prompted Samantha to seek one.

At 9:00 a.m. on June 22, Officer Bobby Lemon of the Fort Wayne Police Department arrived at Samantha's home with Officer John Chambers. Officer Chambers, while witnessing Perry run out of the home, yelled, "police, stop running." Tr. p. 123. Perry looked back at Officer Chambers but continued to run. Another officer was also in pursuit of Perry and yelled that he had a canine unit. At that point, Perry "stopped running and raised his hands in the air." Id. at 124.

While being transported to jail, Perry called his sister, Lacora Perry, telling her that he was being taken to jail. Later that day, Lacora told a detective from the Fort Wayne Police Department that she had last seen Perry on the morning of June 21. When the detective asked Lacora if she drove Perry to Samantha's house on the morning of June 22, Lacora responded, "hell, no. I didn't drive him to that b*tch's house. We don't talk to her." Tr. p. 165.

A few months earlier, on February 16, 2011, Officer Craig Walters of the Fort Wayne Police Department responded to a call from Samantha where she reported that Perry "threw her on the bed and got on top of her and started choking her." Tr. p. 211. On April 12, 2011, the Fort Wayne Police Department responded again to a report of domestic violence from Samantha. Samantha was using the restroom when Perry, upset with something Samantha had posted on Facebook, "grabbed her off the toilet and threw her up against the wall and strangled her in front of her children." Id. at 207. On May 8, 2011, a month before the immediate offense, while Perry and Samantha were arguing, he took her into the back bathroom, straddled her, and choked her. Samantha attempted to

4

escape the choke, which completely restricted her airway, and broke a window by kicking it. Perry's attack left Samantha with "significant redness" on her neck and redness and scratch marks on her left arm. Id. at 201.

On June 28, 2011, the State charged Perry with criminal confinement, a class D felony; strangulation, a class D felony; two counts of domestic battery, a class D felony; residential entry, a class D felony; invasion of privacy, a class D felony; interference with the reporting of a crime, a class A misdemeanor; resisting law enforcement, a class A misdemeanor and with being an habitual offender. The trial court held a jury trial on October 11 and 12, 2011. The jury was given preliminary instructions that an attorney's "final statements are not evidence but given to assist in evaluating the evidence." Tr. p. 41.

Perry testified that he saw the police officers approaching the house but ran anyway. Also, Perry stated that he received the no contact order. During the State's final argument, the trial court admonished the jury that "[t]hese are final arguments that attorneys do to persuade you to their position, but you remember the evidence, all right?" Tr. p. 248-49.

Following deliberation, the jury found Perry guilty of criminal confinement, domestic battery, invasion of privacy, and resisting law enforcement. The jury found Perry not guilty of strangulation, residential entry, and interference with reporting of a crime. Tr. p. 257-58. During the preparation of documents for the habitual offender enhancement phase of the trial, the bailiff informed the court that the prosecutor's closing

5

argument notes mistakenly went to the jury room during deliberation. After the trial court's review, it concluded that there was no new evidence; rather, the notes contained the prosecutor's arguments, which had already been made in open court.

The trial court then brought the jury into the courtroom and inquired into their reliance on the notes. Juror 23 responded that he or she "saw that document, but didn't really think much about it." Tr. p. 267. Juror 73 saw the document, read from the document to the group, but it did not sway the juror in his or her deliberation. Juror 42 read the document, but did not remember what it said and did not use it during deliberations. Collectively, the jury thought, "why is it there?" Id. at 268. Juror 45 "did not use any of that information in [his or her] decision." Id. at 269. Juror 124 also did not use the document in reaching her decision. Juror 69 testified that he or she "saw it, but didn't utilize it at all." Id. at 269.

After the court questioned the jury, defense counsel moved for a mistrial. The trial court denied the motion for a mistrial based on the jurors' "candid" testimony that they did not rely on the notes when making their decisions. Tr. p. 272. Perry then admitted to being a habitual offender. Thereafter, the trial court sentenced Perry to an aggregate term of five years in the Department of Correction. Perry now appeals.

DISCUSSION AND DECISION

Perry argues that the trial court committed reversible error when it denied his motion for a mistrial. Specifically, Perry asserts that the inclusion of the prosecutor's

6

notes in the jury's deliberation packet placed him in a position of "substantial and incurable" peril.  Appellant's Br. p. 8.

"A mistrial is an extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error."  Warren v. State, 725 N.E.2d 828, 833 (Ind. 2000).  Because the trial court is best positioned to assess the circumstances of an error and its probable impact on the jury, the denial of a mistrial lies within the sound discretion of the trial court, and we review the trial court's decision only for abuse of that discretion.  Lucio v. State, 907 N.E.2d 1008, 1010 (Ind. 2009). This court will only reverse a trial court's denial of a motion for a mistrial "if the defendant demonstrates that he was so prejudiced that he was placed in a position of grave peril."  Oliver v. State, 755 N.E.2d 582, 585 (Ind. 2001). "The gravity of the peril is determined by the probable persuasive effect on the jury's decision."  Brooks v State, 934 N.E.2d 1234, 1243 (Ind. Ct. App. 2011).

In this case, the State concedes that the jury's exposure to the prosecutor's notes was inappropriate.  However, to be successful on appeal, Perry must also prove that the exposure to the prosecutor's notes "had a probable persuasive effect on the jury's decision."  Booher v. State, 773 N.E.2d 814, 820 (Ind. 2002).

Here, once the trial court discovered that the prosecutor's notes were included in the deliberation packet, it questioned the jurors whether they relied on the information. The jurors testified that, even though they had knowledge of the prosecutor's notes, the notes were not part of their consideration in reaching their verdicts.  Tr. p.  266-69.

7

Moreover, the overwhelming weight of the evidence against Perry demonstrates that the prosecutor's notes had no persuasive effect on the jury's decision. With regard to the conviction for resisting law enforcement, Perry testified that he saw the police officers approaching Samantha's home and then ran. Id. at 176.

With respect to Perry's conviction for invasion of privacy, Perry testified that he received the no contact order stating that he could not interact with Samantha. Id. Even so, Perry acknowledged that he sent text messages to Samantha and went to Samantha's house. Tr. p. 172. As discussed above, the State presented substantial evidence to support Perry's convictions for domestic battery and criminal confinement. In our view, these circumstances fail to establish that Perry was placed in grave peril or that the jurors' exposure to the prosecutor's notes had a probable persuasive effect on the jury's decision.

Although it was established that the jury did not use the notes in reaching its verdict, Perry nonetheless directs us to Lindsey v. State, 260 Ind. 351, 295 N.E.2d 819 (1973), for the proposition that, "[i]f any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof." Id. at 359. However our Supreme Court distinguished Lindsey in Kimmel v. State, 418 N.E.2d 1152 (Ind. 1981). In Kimmel, the trial court denied the defendant's motion to produce evidence of jury impropriety after defense counsel discovered a newspaper article published during the trial that the defendant argued was prejudicial. Id. at 1155-56. Kimmel relied on Lindsey for the proposition "that the trial court's failure to interrogate the jurors regarding the

8

alleged impropriety was reversible error." Id. at 1156. Our Supreme Court affirmed the trial court and found that the Lindsey procedures "do not apply when alleged jury misconduct was not brought to the court's attention until after the verdict had been rendered." Id.

In the present case, the trial court was not required to follow the Lindsey procedures because the jury rendered a verdict prior to the trial court learning of the misconduct. The Lindsey procedure's purpose is to limit the potential exposure of other jurors to the misconduct so that it does not affect their future deliberation. In the present case, this purpose is absent because deliberation already occurred. Consequently Perry's reliance on Lindsey is misplaced.

Finally, we note that our Supreme Court has stated that "[i]t is now well-settled Indiana law that jurors are permitted to take notes during the course of a trial subject to the discretion of the trial court and its duty to ensure that jurors pay attention to all the evidence in the case." Stephenson v State, 742 N.E.2d 463, 477 (Ind. 2001). Thus, the jury could have taken notes during and regarding the prosecutor's closing argument. For this additional reason, Perry has failed to demonstrate that the inclusion of the prosecutor's notes in the deliberation packet placed him in a position of grave peril, and the trial court did not err in denying his motion for a mistrial.

The judgment of the trial court is affirmed.

KIRSCH, J., and BROWN, J., concur.

9