# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Apr 01 2019, 5:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Emilee L. Stotts
Huntington County Public Defender
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Matthew A. Wintrode, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | April 1, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-1615 <br><br> Appeal from the Huntington <br> Superior Court <br><br> The Honorable Jennifer E. <br> Newton, Judge <br><br> The Honorable Jeffrey R. <br> Heffelfinger, Judge Pro Tempore <br><br> Trial Court Cause No. <br> 35D01-1603-F3-35 |

**Najam, Judge.**

## Statement of the Case

Matthew A. Wintrode appeals his convictions for rape, as a Level 3 felony; battery, as a Level 5 felony; and battery, as a Class A misdemeanor, following a jury trial. Wintrode presents one issue for our review, namely, whether the trial court abused its discretion when it denied his motion for a mistrial based on the cumulative effect of alleged errors in the admission of evidence.

We affirm.

## Facts and Procedural History

E.H. and Wintrode began dating in March 2015.[1] Sometime at the end of April or the beginning of May, Wintrode and E.H. became engaged. Approximately two weeks later, E.H. moved into Wintrode's parents' home with Wintrode. At first, Wintrode and E.H.'s relationship was "good" and "[t]here wasn't any . . . fighting." Tr. Vol. II at 71. But shortly after E.H. moved in with Wintrode, the couple began fighting, and some of the fights "turn[ed] physical." *Id*. at 72. On one occasion, Wintrode and E.H. were watching television in the living room with Wintrode's parents when Wintrode "all of the sudden . . . reached over, grabbed the pet carrier and wacked [E.H.] in the face." *Id*. The pet carrier hit E.H. on the hairline, which hurt "like a bee sting." *Id*. And the

---

[1] E.H. was an eighteen-year-old senior in high school, and Wintrode had graduated from high school the year prior.

pet carrier left a "zipper mark" on E.H.'s face, which lasted for "[a] few days." *Id*.

[4] Thereafter, at the end of June or the beginning of July, E.H. and Wintrode moved out of Wintrode's parents' house, and they moved in with their family friends Nick and Mary Brown. While they were living with the Browns, E.H. discovered that she was pregnant. E.H. then informed Wintrode of her pregnancy.

[5] Approximately one or two days after E.H. had discovered that she was pregnant, E.H. asked Wintrode if they could speak in his truck. Once E.H. and Wintrode were in his truck, E.H. accused Wintrode of cheating on her. Wintrode initially denied the allegations, but he ultimately admitted that he had cheated on E.H. E.H. then slapped Wintrode. Wintrode got angry and "smashed [E.H.'s] head into his truck window." *Id*. at 78. As a result, E.H. had "blurred vision for a few hours" and "some really bad headaches for about a week." *Id*. at 80. She also had some bruising on her left jaw and "underneath the hair." *Id*. at 81.

[6] In early September, the Browns asked E.H. and Wintrode to leave their home because of "[a]ll their arguing and fighting." *Id*. at 84. E.H. and Wintrode moved into an apartment on Grayston Avenue. After they had moved out of the Browns' home, there were "hardly any day[s]" that Wintrode and E.H. did not fight. *Id*. at 85.

[7] E.H.'s pregnancy was "awful," and she vomited "multiple times a day." *Id.* at 88. One day, after E.H. had gotten sick, she went to bed and tried to sleep. E.H. was lying on her side when Wintrode went into the bedroom and said that "he wanted to [have] sex." *Id.* at 87. E.H. did not want to have sex. *Id.* at 88. But Wintrode proceeded to take his clothes off. E.H. again told Wintrode no, but Wintrode told E.H. to "shut up and take it like a cowgirl." *Id.* Wintrode then got into the bed, forced E.H. onto her back, and "started taking [E.H.'s] clothes off." *Id.* at 91. E.H. "kept telling [Wintrode] no," and she tried to kick and push him off of her. *Id.* But Wintrode did not stop and had sexual intercourse with E.H. As a result of the incident, E.H. had bruises on her legs that lasted for a "few months." *Id.* at 95.

[8] On September 16, E.H. ended the relationship "because [she] had had enough of it." *Id.* at 98. E.H. then returned to her parents' house. Over the next two weeks, E.H. told her parents "bits and pieces" of what had occurred with Wintrode. *Id.* at 103. E.H.'s father encouraged E.H. to report Wintrode's actions to the police. On October 1, E.H. and her father went to the Huntington Police Department ("HPD") and spoke with Officer Dale Osborn. E.H. told Officer Osborn that she "had been . . . battered and raped" by Wintrode. *Id.* at 183. The next day, she returned to the police department so that Officer Osborn could take photographs of the bruises on her legs.

[9] Officer Osborn interviewed Wintrode on November 3. During the interview, Wintrode denied having ever hit E.H. or forcing E.H. to have sex with him. However, when Officer Osborn asked Wintrode about the events that had

occurred in the truck, Wintrode stated that "he grabbed [E.H.'s] hands" and "then he heard her head hit the window[.]" *Id.* at 193.

[10] Thereafter, HPD Detective Shane Blair conducted two interviews of Wintrode. During the first interview on February 3, 2016, Detective Blair asked Wintrode about the incident that had occurred at his parents' house. Wintrode admitted to Detective Blair that "he did swing . . . that pet carrier bag at [E.H.] and hit her in the face with that." *Id.* at 149. Detective Blair also asked Wintrode about the incident that had occurred in his truck while he and E.H. lived with the Browns. Wintrode told Detective Blair that, after E.H. had slapped him, he "managed to take her head into the window." *Id.* at 151. During the interview, Wintrode denied E.H.'s allegations that he had forced her to have sex with him.

[11] On March 24, the State charged Wintrode with one count of rape, as a Level 3 felony; one count of battery, as a Level 5 felony; and one count of battery, as a Class A misdemeanor. Prior to trial, Wintrode filed a motion *in limine*, in which Wintrode sought to exclude any "opinion testimony regarding undiagnosed mental health conditions of the defendant, specifically bi-polar disorder and anger management issues." Appellant's App. Vol. III at 62. The trial court granted Wintrode's motion.

[12] At Wintrode's ensuing jury trial, the State called Sarah Coburn, a board-certified sexual assault nurse examiner, as a witness. Over Wintrode's objection, Coburn testified about the likelihood of recovering forensic evidence in sexual assault cases. Specifically, Coburn testified that it is "not likely at all"

to recover physical evidence from a victim of sexual assault if the victim reports the assault two weeks after it had occurred. Tr. Vol. III at 26. On cross-examination, Coburn testified that she had never met E.H. and that she could not speak to any specifics of this case.

[13] The State also called Robin James as a witness. James is a licensed counselor and clinician at the Stop Child Abuse and Neglect program in Fort Wayne. Over Wintrode's objection, James testified about the behaviors of victims of domestic abuse. Specifically, James testified that it is "[n]ot unusual at all" for a victim of domestic violence to continue to say that they love a person or to plan a future with someone after an act of violence had occurred. *Id*. at 67. On cross-examination, James testified that she did not know anything about the facts of this case and that she could not give an opinion as to whether E.H. had been a victim of domestic violence.

[14] The State further presented as evidence the testimony of Detective Blair. Detective Blair testified, over Wintrode's objection, that, during his second interview of Wintrode on February 8, 2016, Wintrode stated that he would "threaten[] suicide to get things that he wants." *Id*. at 163. At the conclusion of the State's evidence, Wintrode moved for a mistrial "based on numerous prejudice[es]" that had occurred. *Id*. at 193. Specifically, Wintrode asserted that he had been denied the right to a fair trial because of the "testimony of the domestic violence expert" and because of the "suicidal . . . threats [that] came out during [Detective] Blair's testimony." *Id*. at 196-97. The trial court denied Wintrode's motion.

The jury found Wintrode guilty of rape, as a Level 3 felony; battery, as a Level 5 felony; and battery, as a Class A misdemeanor. The trial court entered judgment of conviction accordingly and sentenced Wintrode to an aggregate term of nineteen years, with fourteen years executed in the Department of Correction and five years suspended to probation. This appeal ensued.

## Discussion and Decision

Wintrode asserts that the trial court abused its discretion when it denied his motion for a mistrial. As we have explained:

> A mistrial is an extreme remedy granted only when no other method can rectify the situation. A trial court's decision not to grant a mistrial is reviewed for an abuse of discretion. Moreover, a reviewing court accords great deference to the trial court's ruling on a mistrial motion. In determining whether a mistrial was warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected. The gravity of the peril is determined by the probable persuasive effect on the jury's decision. When a motion for mistrial has been denied, the defendant has the burden to demonstrate both that he was placed in a position of grave peril to which he should not have been subjected and that no other remedy can cure the perilous situation in which he was placed.

*Brooks v. State*, 934 N.E.2d 1234, 1243 (Ind. Ct. App. 2010) (citations and quotation marks omitted), *trans. denied*.

On appeal, Wintrode contends that the trial court abused its discretion when it denied his motion for a mistrial because it had committed several errors in the admission of evidence. As the Indiana Supreme Court has stated:

> Generally, a trial court's ruling on the admission of evidence is accorded "a great deal of deference" on appeal. *Tynes v. State*, 650 N.E.2d 685, 687 (Ind. 1995). "Because the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion" and only reverse "if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014) (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind.2013)).

*Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015).

[18] Wintrode specifically contends that the trial court abused its discretion when it admitted into evidence the following: (1) Detective Blair's testimony regarding Wintrode's use of suicidal threats; (2) Coburn's testimony about the low likelihood of finding forensic evidence two weeks after an alleged sexual assault; and (3) James' testimony that it is not unlikely for a victim of domestic violence to continue to plan a future with someone after an act of violence had occurred. And Wintrode contends that the cumulative effect of the erroneously admitted evidence "resulted in unfair prejudice" and violated his "due process rights to a fair trial." Appellant's Br. at 8. We address each contention in turn.

[19]     Wintrode first contends that the trial court abused its discretion when it admitted as evidence Detective Blair's[2] testimony that, during the February 8, 2016, interview, Wintrode mentioned that he would "threaten[] suicide to get things he wants." Tr. Vol. III at 163. Wintrode contends that the trial court abused its discretion when it admitted that testimony because it "concerned undiagnosed mental health issues" of Wintrode, which testimony "was precluded by a previously granted Motion in Limine."[3] Appellee's Br. at 10.

[20]     Wintrode is correct that, prior to trial, the court granted a motion *in limine* that precluded the State from introducing "opinion testimony regarding undiagnosed mental health conditions" of Wintrode. Appellant's App. Vol. III at 62. But we cannot agree that Detective Blair's testimony concerned any undiagnosed mental health issues. Wintrode's statement to Detective Blair that he would threaten suicide to get what he wants is not evidence that Wintrode is actually suicidal or that he otherwise suffers from depression or any other mental health disorder. Instead, Wintrode's statement to Detective Blair was simply an admission that Wintrode would manipulate E.H. in order to get what

---

[2] In his brief on appeal, Wintrode states that Sergeant Matthew Collins with the Indiana State Police testified about Wintrode's use of suicidal threats. However, it was Detective Blair, not Sergeant Collins, who provided that testimony. *See* Tr. Vol. III at 163.

[3] Wintrode does not provide a citation to the motion *in limine* in the record. Rather, he simply states that the motion can be found at: "App. Appendix Vol. ___ p. ___." Appellant's Br. at 10. We remind counsel that each contention on appeal "must be supported by citations to authority, statutes, *and the Appendix or parts of the record relied on*, in accordance with Rule 22." Ind. Appellate Rule 46(A)(8)(a) (emphasis added).

he wanted. Because Wintrode's statement to Detective Blair was not evidence of an undiagnosed mental health issue, Detective Blair's testimony did not violate the motion *in limine*, and the trial court did not abuse its discretion when it admitted that testimony.

[21] Still, Wintrode further contends that the trial court abused its discretion when it admitted Detective Blair's testimony because the State had failed to provide adequate notice that it intended to introduce that evidence, which Wintrode contends was a violation of Indiana Evidence Rule 404(b). Indiana Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evidence Rule 404(b)(2). Further, on request by a defendant in a criminal case, the prosecutor must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial[.]" Evid. R. 404(b)(2)(A).

[22] Wintrode specifically contends that, while the State provided notice of its intent to introduce evidence under Indiana Evidence Rule 404(b), the State's notice "failed to include that [Detective Blair] would testify to any mental health related testimony, specifically, [Wintrode's] use of suicidal threats. Appellant's Br. at 11. In essence, Wintrode contends that the trial court abused its discretion when it admitted Detective Blair's testimony as evidence because he

had not received adequate notice regarding the contents of Detective Blair's testimony, which lack of notice caused him "unfair surprise." *Id.* We cannot agree.

[23] The State filed its first list of witnesses and exhibits on March 31, 2017, almost one full year before the date of Wintrode's trial. In that notice, the State named Detective Blair as a potential witness. Further, the State provided that it planned to introduce as evidence the "[i]nterview of suspect Matthew Wintrode recorded on February 8, 2016." Appellant's App. Vol. II at 123. Accordingly, Wintrode received notice almost one year prior to his trial that the State intended to introduce as evidence any statements that Wintrode had made to Detective Blair during the February 8, 2016, interview, which included Wintrode's statements that he threatened suicide to get what he wants. Accordingly, we cannot say that Wintrode was unfairly surprised by Detective Blair's testimony or that he did not receive notice of the State's intention to introduce that evidence. As such, we cannot say that the trial court abused its discretion when it admitted Detective Blair's testimony as evidence.

### *Coburn's Testimony*

[24] Wintrode next contends that the trial court abused its discretion when it admitted Coburn's testimony that an examination of a victim of sexual assault would be unlikely to produce forensic evidence two weeks after the alleged

sexual assault had occurred.[4] Wintrode specifically asserts that Coburn's testimony was inadmissible "because it moves from education to credibility vouching for [E.H.]" in violation of Indiana Evidence Rule 704. Appellant's Br. at 13.

[25] Indiana Evidence Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of the allegations; whether a witness has testified truthfully; or legal conclusions." On appeal, Wintrode contends that "the trial court caused unfair prejudice and inflammatory thoughts in the minds of the jurors" when it allowed Coburn to testify as an expert witness because her testimony vouched for E.H. "not having an exam done." Appellant's Br. at 13. In essence, Wintrode contends that, because Coburn's testimony partially corroborated E.H.'s allegations, Coburn's testimony improperly vouched for E.H.

[26] "Indiana Evidence Rule 704(b) prohibits a witness from testifying about wither a witness *has testified* truthfully." *Halliburton v. State*, 1 N.E.3d 670, 680-81 (Ind. 2013) (emphasis in original, quotation marks removed). Here, while Coburn testified that it would be very unlikely for an examiner to find forensic evidence

---

[4] The State asserts that Wintrode waived this issue because he did not specifically raise Coburn's testimony as a basis for his motion for a mistrial to the trial court. While he did not specifically cite to Coburn's testimony as a basis for his motion, Wintrode asserted that the mistrial was warranted due to several allegedly erroneous rulings on the admission of evidence during the trial. Because Wintrode's argument on appeal is that the trial court abused its discretion when it denied his motion for a mistrial due to the cumulative effect of the court's errors in the admission of evidence, and because Wintrode timely objected to Coburn's testimony at trial, we will consider Wintrode's argument that the trial court abused its discretion when it admitted her testimony as evidence.

if a victim does not report the assault until two weeks after it had occurred, Coburn did not testify about whether E.H. had testified truthfully. Neither did Coburn provide any opinion regarding Wintrode's guilt or innocence or the truth or falsity of E.H.'s allegations against Wintrode. Indeed, at no point did Coburn provide any testimony that E.H. had been the victim of sexual assault or that Wintrode had sexually assaulted E.H. Rather, Coburn testified that she had never met E.H., that E.H. had never been seen at the treatment center where Coburn is employed, and that she did not have any specific knowledge about this case. Accordingly, Wintrode has not demonstrated that Coburn's testimony vouched for E.H. or otherwise implicated Wintrode in the commission of any offense. We cannot say that the trial court abused its discretion when it admitted Coburn's testimony.

### *James' Testimony*

Finally, Wintrode asserts that the trial court abused its discretion when it admitted as evidence James' testimony that it would not be unlikely for a victim of domestic abuse to continue to plan a future with a person after an act of violence had occurred. Wintrode contends that the trial court abused its discretion when it admitted that testimony because it potentially confused the jury and because the probative value of the testimony was substantially outweighed by unfair prejudice. In essence, Wintrode contends that the trial court should have excluded James' testimony pursuant to Indiana Evidence Rule 403.

[28] Indiana Evidence Rule 403 provides that the court "may exclude evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." On appeal, Wintrode specifically contends that, "[w]hile there is probative value in producing testimony" in a case that concerns domestic violence, he was unfairly prejudiced by James' testimony because her testimony "could be potentially confusing to the jury." Appellant's Br. at 14.

[29] But Wintrode does not make any argument on appeal as to why James' testimony was confusing to the jury, nor does he present any evidence that James' testimony actually confused the jury. Rather, Wintrode simply contends, without more, that James' testimony "could potentially be" confusing because James was not directly involved in the case. Appellant's Br. at 14. Further, Wintrode has not shown that he was prejudiced by James' testimony. Here, James testified that she was not involved with the case and that she did not know anything about the facts of the case. Indeed, James testified that she could not say whether E.H. had been the victim of domestic violence. And James did not provide any testimony to indicate that Wintrode had committed any acts of domestic violence. Accordingly, Wintrode has not demonstrated that the jury was confused by James' testimony or that the probative value of James' testimony was substantially outweighed by any prejudice. We therefore cannot say that the trial court abused its discretion when it admitted James' testimony as evidence.

*Conclusion*

[30] In sum, the trial court did not abuse its discretion when it admitted the testimony of Detective Blair, Coburn, or James as evidence. Accordingly, Wintrode has not demonstrated that, due to the admission of that evidence, he was placed in a position of grave peril such that a mistrial was warranted based on either the alleged errors individually or cumulatively. *Brooks*, 934 N.E.2d at 1243. The trial court therefore did not abuse its discretion when it denied Wintrode's motion for a mistrial. We affirm the trial court.

[31] Affirmed.

Pyle, J., and Altice, J., concur.